RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0225p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

SARAH ANN CALVETTI (15-1526); DEMAS
HERNANDEZ CORTEZ (15-1558),

*Defendants-Appellants.*

Nos. 15-1526/1558

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:14-cr-20209—Sean F. Cox, District Judge.

Argued:  August 4, 2016

Decided and Filed:  September 8, 2016

Before:  SUHRHEINRICH, ROGERS, and GRIFFIN, Circuit Judges.

_____

### COUNSEL

**ARGUED:**  Benton C. Martin, FEDERAL DEFENDER OFFICE, Detroit, Michigan, for
Appellant in 15-1526.  John W. Brusstar, Detroit, Michigan, for Appellant in 15-1558.  Shane N.
Cralle, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.  **ON
BRIEF:**  Benton C. Martin, Natasha D. Webster, FEDERAL DEFENDER OFFICE, Detroit,
Michigan, for Appellant in 15-1526.  John W. Brusstar, Detroit, Michigan, for Appellant in 15-
1558.  Shane N. Cralle, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for
Appellee.

GRIFFIN, J., delivered the opinion of the court in which ROGERS and
SUHRHEINRICH, JJ., joined.  SUHRHEINRICH, J. (pp. 20–22), delivered a separate
concurring opinion.

1

———————

**OPINION**

———————

GRIFFIN, Circuit Judge.  In this consolidated case, defendants Sarah Calvetti and Demas Cortez appeal their convictions for drug trafficking offenses.  The precedentially significant issue raised is whether Calvetti's consent to search her residence falls within the ambit of the Fifth Amendment. We hold that it does not.  In doing so, we join the majority of our sister circuits in concluding that consenting to a search is not an incriminating statement under the Fifth Amendment because it is not testimonial or communicative evidence.  Because the remaining issues are also without merit, we affirm.

I.

On March 26, 2014, Michigan State Police Trooper Craig Ziecina was patrolling from the median of Interstate Highway I-75 when he observed a minivan driven by defendant Sarah Calvetti abruptly slow down and change lanes without signaling.  The minivan merged directly in front of another vehicle, causing it to slow down, and requiring other cars to drive around it to keep pace with traffic.  Trooper Ziecina also noticed that Calvetti's arms were locked in a rigid, unnatural position on the steering wheel and that she had a frozen, cold expression on her face. Thereafter, Ziecina pulled onto the highway and followed the minivan.  The minivan remained in the center lane moving at or below the posted minimum speed of 55 miles per hour.  After about three miles, Ziecina activated his patrol car lights for the purpose of citing Calvetti for failure to signal before changing lanes, impeding traffic, and driving below the minimum speed.

Calvetti pulled over.  Trooper Ziecina then approached the minivan, asking Calvetti and her passenger, defendant Demas Cortez, for their driver's licenses, registration, and proof of insurance.  Cortez produced his identification but Calvetti could not find her driver's license, explaining that she had probably left her purse at a restaurant.  Thereafter, Trooper Ziecina directed Calvetti to accompany him to his patrol car while he looked up her driver's license information.

In the patrol car, Ziecina asked Calvetti questions about her travel plans. Their conversation was recorded with the initial conversation lasting approximately five minutes. Calvetti told the trooper that she (1) owned the minivan, (2) had flown to Texas two weeks earlier, (3) was moving Cortez from Texas to Michigan, and (4) had driven straight through from Texas to Michigan. Calvetti also volunteered that the day before, she had been pulled over in Mississippi at which time her minivan was searched.

After this conversation, Ziecina then left the patrol car to speak with Cortez. In doing so, the trooper noticed that there were few personal belongings inside the minivan. When Ziecina returned to the patrol car, his database check revealed that the minivan was not registered to Calvetti. Confronted with this discrepancy, Calvetti explained that she was still in the process of buying the minivan but had not completed the sale. Thereafter, in response to Ziecina's questions, Calvetti stated that she was responsible for all of the vehicle's contents, denied there was anything illegal in the van, and authorized the police to search it. At that point, the traffic stop had lasted approximately fifteen minutes.

At about this time, Michigan State Police Officer Jeffery Schrieber arrived as a back-up officer with a drug-sniffing dog. Promptly, Schrieber conducted a canine sniff of the vehicle. Although the dog showed some interest in the seams of the minivan floor, it did not alert.

Back at the patrol car, Ziecina asked Calvetti if she had ever been arrested. In response, she admitted to serving probation for a non-felony drug conviction. She also volunteered that Cortez had a felony drug charge involving fifty pounds of marijuana, had been incarcerated for eighteen years, smoked marijuana, and had been involved in a shootout. Ziecina observed that Calvetti acted very nervously throughout their conversation, did not make eye contact, was sweating and shaking, touched her face, and "search[ed] for answers" to simple questions.

Approximately thirty-five minutes into the traffic stop, the officers moved Cortez to the patrol car with Calvetti while the officers searched the minivan. Neither defendant was restrained. The car's audio recording system recorded a conversation between Calvetti and Cortez. They conferred as to whether their independent answers to Ziecina's questions matched and made observations about the drug-sniffing dog's behavior. As the search continued, Calvetti

said that she was "not doing this anymore," wondered whether the patrol car contained a recording device, and told Cortez that he would have to take the blame. Calvetti also talked to a co-conspirator on Cortez's cell phone, alerting the co-conspirator that the police were searching the minivan using a drug-sniffing dog. Calvetti then erased the co-conspirator's number from the cell phone.

During the search, Ziecina observed "discrepancies" in the minivan's design, including seats that looked as if they had been "built upward," a vehicle floor that appeared "too thick," and visible sheet metal on the driver's side sliding door. He suspected that someone had installed a hidden contraband trap under the minivan floor. Ziecina inserted an optical scope into an opening in the floor, revealing areas where the floor had been welded. He then removed a center portion of the floor and inserted the scope again, observing five kilogram-sized packages.

Cortez and Calvetti were then arrested. Aided by Cortez, who did not want the trap damaged, the officers opened the trap and found sixteen kilograms of cocaine. The officers then transported Calvetti and Cortez to the U.S. Drug Enforcement Administration's (DEA) field office for questioning. The duration of the stop until the time of arrest was about one hour and thirteen minutes.

At the DEA office, agents informed Cortez of his *Miranda* rights, and he signed a waiver agreeing to answer questions. Cortez told agents that he took the minivan to Mexico to buy cocaine and have the trap installed. He planned to split the profits with co-conspirator Yasiel Garcia and provided the agents with Garcia's phone number. Agents later determined that this was the same number from which Calvetti received a phone call in the patrol car. Cortez agreed to help the agents with a controlled delivery but subsequently tipped off the buyer.

As they interviewed Cortez, the agents sometimes left the room to talk to Calvetti, a technique known as "whipsawing." After the agents advised Calvetti of her rights, she signed a *Miranda* form indicating that she understood her rights but did *not* want to answer questions. Nevertheless, the agents questioned Calvetti, explaining that they wanted her help with the investigation. The agents asked her about her travel plans, ownership of the minivan, and her residence in Dearborn Heights. Thereafter, the agents asked and obtained Calvetti's permission

to use her Dearborn Heights residence to stage a controlled delivery. Calvetti then signed a consent for the search of her house. The written consent stated that she "freely consent[ed]" to a search of her Dearborn Heights residence and she had "not been threatened, nor forced in any way."

After the controlled delivery failed, the DEA and Michigan State Police searched Calvetti's residence. The residence was nearly empty, even though Calvetti had rented it for four months. The search uncovered drug packing materials, including boxes of clear plastic wrap, dryer sheets, grease, and Ziploc bags—materials similar to those that had been used to wrap the cocaine found in the minivan's hidden trap.

Subsequently, a grand jury indicted Calvetti and Cortez each on two counts: conspiracy to possess with intent to distribute and to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841, 846, and possession with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 841(a)(1). In the district court, Calvetti moved to suppress her statements made to the DEA agents and the fruits of the search of her Dearborn Heights residence on the basis that the agents violated her *Miranda* rights. After an evidentiary hearing at which DEA Agent Jeffrey Moore testified, the district court ruled that Calvetti had implicitly waived her right to remain silent by answering Agent Moore's questions after receiving *Miranda* warnings. Finding no *Miranda* violation, the district court denied Calvetti's motion.

Calvetti and Cortez also filed a joint motion to suppress the cocaine found in the minivan. Cortez argued that the arresting officers had unconstitutionally prolonged the traffic stop without reasonable suspicion of criminal activity. Calvetti maintained that there was no probable cause to initiate the traffic stop because she was driving in compliance with Michigan law.

Regarding the joint motion to suppress, the district court held a second evidentiary hearing. After reviewing supplemental briefing on the validity of the traffic stop, the district court denied both motions to suppress, ruling that (1) the officers had probable cause to stop the vehicle because Calvetti changed lanes without using her turn signal, and (2) the officers had

reasonable suspicion of criminal activity to justify prolonging the traffic stop beyond the time reasonably required to issue a traffic citation.

A jury convicted both defendants on all counts. After the trial, in support of their joint motion for a new trial, defendants renewed their motion to suppress the evidence found in the minivan. The district court denied the motion. The district court sentenced Calvetti to 121 months in prison on each count, to run concurrently. The district court sentenced Cortez as a career offender to 360 months. On appeal, Calvetti and Cortez challenge the denials of their motions to suppress. In addition, Calvetti argues that there was insufficient evidence to sustain her convictions, and Cortez challenges his sentence.

II.

We begin with defendants' suppression challenges. "In reviewing a district court's denial of a motion to suppress evidence, this court reviews the district court's findings of fact for clear error, and its legal conclusions *de novo*." *United States v. Gillis*, 358 F.3d 386, 390 (6th Cir. 2004). We consider the evidence in the light most favorable to the government. *United States v. Pearce*, 531 F.3d 374, 379 (6th Cir. 2008).

A.

Calvetti argues that her statements to the DEA agents and consent to search her residence were obtained in violation of her Fifth Amendment rights. The district court disagreed, finding that Calvetti had waived her right to remain silent by answering Agent Moore's questions after receiving and acknowledging the *Miranda* warnings. Calvetti maintains that the questioning should not have begun because she clearly invoked her right to remain silent by indicating on the *Miranda* waiver form at the beginning of her interview that she was not willing to answer questions.

If a defendant invokes the right to remain silent at any time, prior to or during the interrogation, questioning must cease. *Miranda v. Arizona*, 384 U.S. 436, 473–74 (1966). A defendant's invocation of her right to remain silent must be clear and unambiguous. *Berghuis v. Thompkins*, 560 U.S. 370, 380–83 (2010). Here, Calvetti clearly and unambiguously invoked

her right to remain silent by signing her full name on the "no" signature line below the question "Are you willing to answer some questions?" *See United States v. Scott*, 693 F.3d 715, 719 (6th Cir. 2012) (writing "no" in response to the written question "Having these rights in mind, do you wish to talk to us now?" invokes the right to counsel). Agent Moore noticed Calvetti's "no" signature on the waiver form, but immediately began asking her questions regardless.

The district court thus erred in ruling that Calvetti waived her right to remain silent by responding to the improper questioning. *See Michigan v. Mosley*, 423 U.S. 96, 103 (1975) ("Police must 'scrupulously honor' a suspect's 'right to cut off questioning.'" (quoting *Miranda*, 384 U.S. at 479)). The Fifth Amendment privilege against self-incrimination, however, "is a fundamental *trial right* of criminal defendants." *McKinley v. City of Mansfield*, 404 F.3d 418, 437 (6th Cir. 2005) (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 264 (1990)) (emphasis added). "Although conduct by law enforcement officials prior to trial may ultimately impair that right, a constitutional violation occurs only at trial." *Verdugo-Urquidez*, 494 U.S. at 264. "By its terms, the Fifth Amendment does not prohibit the act of compelling a self-incriminating statement other than for use in a criminal case." *Lingler v. Fechko*, 312 F.3d 237, 239 (6th Cir. 2002).

Here, the prosecution did not use any of Calvetti's statements against her at trial. Calvetti points to Agent Moore's testimony at trial that when he "talked to Ms. Calvetti, she wanted to assist with the controlled delivery" as impermissible. However, that statement, and Agent Moore's subsequent testimony that Calvetti told him the agents could use her house for the controlled delivery so long as no arrest was made in view of her neighbors, were elicited on cross examination by Cortez's and Calvetti's trial attorneys respectively. Because the prosecution did not present any of Calvetti's statements to the DEA agents at trial, and therefore did not use the illegally-obtained evidence against her, Calvetti has not suffered any injury against which the Fifth Amendment protects.[1] *See Oregon v. Elstad*, 470 U.S. 298, 306–07 (1985) (the Fifth Amendment prohibits *the prosecution's* use of compelled testimony in its case in chief).

---

[1]Calvetti also argues that the impermissible interrogation taints Cortez's admissions because the agents "whipsaw[ed]" defendants by going back and forth between them during the interrogation. But Calvetti failed to develop this argument in her opening brief, noting only that the interrogation ended with Cortez making

Calvetti also argues that the evidence found at her residence should have been suppressed because the *Miranda* violation tainted her consent to search it. The government counters that a consent to search falls outside the scope of *Miranda*'s protections. We agree with the government.

*Miranda* warnings are not independent rights; rather, they are prophylactic rules stemming from the Fifth Amendment privilege against self-incrimination. *See Maryland v. Shatzer*, 559 U.S. 98, 103 (2010). The privilege "protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature." *Pennsylvania v. Muniz*, 496 U.S. 582, 589 (1990) (internal quotation marks omitted). "[I]n order to be testimonial, an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information." *Id.* at 594 (internal quotation marks omitted).

In *United States v. Cooney*, we ruled that the *Cooney* defendant's signing of a consent to search form after invoking her right to remain silent did not violate the Fifth Amendment because "the consent is not evidence of a testimonial or communicative nature." 26 F. App'x 513, 523 (6th Cir. 2002). Giving consent to search is not in itself a testimonial statement because it does not "relate a factual assertion or disclose information." *See Muniz*, 496 U.S. at 594. While the *Cooney* defendant's consent to search led to the disclosure of incriminating documents, that evidence was physical, not testimonial. *Cooney*, 26 F. App'x at 518–19. Consenting to a search is therefore not the type of statement that falls within the protections of the Fifth Amendment. *See Elstad*, 470 U.S. at 304 ("The Fifth Amendment, of course, is not concerned with nontestimonial evidence.").

This approach is consistent with the majority of our sister circuits. *See Cooney*, 26 F. App'x at 523 (surveying circuit cases); *see also United States v. Hidalgo*, 7 F.3d 1566, 1568 (11th Cir. 1993) ("A consent to search is not a self-incriminating statement; '[i]t is not in itself evidence of a testimonial or communicative nature.' We are not alone in our position on this

---

incriminating statements, not that Cortez's statements should be suppressed as a fruit of an illegal interrogation. She only offered a single sentence in her reply brief, and she failed to cite to the record or any legal authority in support. She has therefore abandoned this argument. *See, e.g., Vander Boegh v. EnergySolutions, Inc.*, 772 F.3d 1056, 1063 (6th Cir. 2014) (perfunctory and undeveloped arguments are abandoned on appeal).

issue [as] '[e]very federal circuit court which has addressed [this issue] has reached the conclusion that a consent to search is not an incriminating statement.'" (internal citation omitted)); *Cody v. Solem*, 755 F.2d 1323, 1330 (8th Cir. 1985) ("Simply put, a consent to search is not an incriminating statement. . . . While the search taken pursuant to that consent disclosed incriminating evidence, this evidence is real and physical, not testimonial.").

Calvetti urges us to adopt the opposing view, as articulated by the United States District Court for the District of Columbia, that while a request to search "may not always lead to a testimonial self-incriminating statement, [it] nevertheless seeks 'self-incriminating' information from the suspect by the 'testimonial action' of the defendant, to whit [sic]: signing the consent form, something that requires the advice of counsel as much as answering any question directly put to the subject." *United States v. Fleming*, 31 F. Supp. 2d 3, 5 n.3 (D.D.C. 1998). However, the majority rule is more compelling. As the *Fleming* court implicitly acknowledged, a request to search will not always lead to an incriminating response, and the evidence produced from a search is not testimonial, but real or physical. *See id.*; *see also Cody*, 755 F.2d at 1330.

Accordingly, as the majority of our sister circuits have held, a consent to search is not a self-incriminating statement subject to the protection of the Fifth Amendment. The violation of Calvetti's Fifth Amendment right to remain silent provides no basis for suppressing the evidence found in her Dearborn Heights home arising out of her consent to search.

B.

Alternatively, Calvetti contends that her consent to search was involuntary, given the totality of the circumstances, including that: (1) she had just driven for 24 hours; and (2) she was not informed, either by the agents or on the form she signed, that she could refuse consent. There are procedural and substantive flaws with this claim.

Procedurally, Calvetti did not include this issue in the table of contents or in the "issues presented" section of her appellate brief. Under Federal Rule of Appellate Procedure 28(a)(5), "[t]he appellant's brief *must* contain, under appropriate headings and in the order indicated: . . . a statement of the issues presented for review[.]" Fed. R. App. P. 28(a)(5) (emphasis added). Accordingly, we may dismiss this suppression challenge as forfeited. *See,*

*e.g.*, *United States v. Honeycutt*, 816 F.3d 362, 370 (6th Cir. 2016) (argument not listed in statement of issues can be deemed waived); *Barrett v. Detroit Heading, LLC*, 311 F. App'x 779, 796 (6th Cir. 2009) (holding that "[t]he provisions of Rule 28(a) are . . . unambiguously mandatory," and waiving an argument not listed in the statement of issues presented).

However, even assuming Calvetti properly presented this issue in her brief, she did not present it in the district court. The briefs and oral argument below focused on whether Calvetti's right to remain silent had been violated or waived. We have explained that while Fifth Amendment waiver and Fourth Amendment consent-to-search inquiries may overlap in some respects, they are not the same. *United States v. Montgomery*, 621 F.3d 568, 573 (6th Cir. 2010). Accordingly, we review for plain error. *See United States v. Lopez-Medina*, 461 F.3d 724, 739 (6th Cir. 2006) ("[W]e have applied Rule 52(b)'s plain error review to new suppression arguments raised for the first time on appeal after a defendant's original suppression arguments proved unsuccessful at the trial court level."). Under plain-error review, Calvetti must demonstrate: "(1) error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, [this] court may exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or reputation of judicial proceedings." *United States v. Lalonde*, 509 F.3d 750, 757–58 (6th Cir. 2007) (internal quotation marks and citation omitted).

With respect to sleep-deprivation, although Calvetti told Trooper Ziecina during the traffic stop that she drove for 24 hours, she never claimed she was sleep-deprived and provided no evidence in the form of an affidavit or other documentary evidence in support of this factual assertion.

Furthermore, she never stated during questioning that she was tired, confused, or uncomfortable. Nor did the agents subject her to sleep deprivation. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (identifying as a relevant factor *law enforcement's* "use of physical punishment such as the deprivation of food or sleep"). Moreover, tiredness, or even exhaustion, does not compel the conclusion that Calvetti's "will was overborne" or her "capacity for self-determination critically impaired." *Cf. id.*; *Jackson v. McKee*, 525 F.3d 430, 434–35 (6th Cir. 2008) (surveying deprivations resulting in involuntary confessions). Finally, her age,

education, and intelligence, and the relatively short length of questioning counterbalance Calvetti's unsupported allegation that she was tired, as nothing in the record suggests she was vulnerable as a result of those factors.[2] *See Schneckloth*, 412 U.S. at 226.

Regarding Calvetti's assertion that she did not know she could refuse consent, the Supreme Court has rejected the argument that "consent could not be valid unless the defendant knew that he had a right to refuse the request." *Ohio v. Robinette*, 519 U.S. 33, 39 (1996). It is "one factor to be taken into account." *Id.* (quoting *Schneckloth*, 412 U.S. at 227). "And just as it 'would be thoroughly impractical to impose on the normal consent search the detailed requirements of an effective warning,' so too would it be unrealistic to require police officers to always inform detainees that they are free to go before a consent to search may be deemed voluntary." *Id.* at 39–40 (quoting *Schneckloth*, 412 U.S. at 231) (internal citation omitted). In this case, the consent-to-search form indicated that Calvetti "freely consent[ed]" to the search" and had "not been threatened, nor forced in any way." Again, balanced against her age, education, intelligence, and length of questioning, Calvetti's will was not overborne. Calvetti has not shown plain error.

## C.

Defendants jointly challenge the district court's denial of their motions to suppress evidence seized from the minivan, arguing that the officers lacked reasonable suspicion to prolong the traffic stop to accommodate searching the minivan with a drug-sniffing dog.[3] "Whether an officer had reasonable suspicion under the circumstances is a mixed question of law and fact," the legal aspect of which we review de novo. *United States v. Stepp*, 680 F.3d 651,

---

[2]At the time of her arrest, Calvetti was 47 years old, had no medical, mental, or emotional health problems, had earned an Associate of Science degree and a license in vocational nursing, and had been working as a nurse for over ten years. The traffic stop was made at around 12:30 p.m. Calvetti's interview began at approximately 3:45 p.m., and by 6:00 p.m. the agents had her consent to search, allowing Cortez to call his co-conspirator to set up the controlled delivery at Calvetti's home.

[3]Cortez also challenges the traffic stop itself, arguing that Trooper Ziecina lacked probable cause to believe Calvetti had committed a traffic violation because it is not illegal in Michigan to travel at 55 miles per hour in the center lane. The district court, however, found that Ziecina had probable cause to stop the minivan independent of whether Calvetti was travelling at or below the speed limit because he saw Calvetti violate M.C.L. § 257.648 by changing lanes without signaling. Because neither defendant challenges this finding on appeal, we will not disturb it.

660 (6th Cir. 2012). Factual findings underlying the legal determination are reviewed for clear error. *Id.*

A vehicle stop "constitutes a seizure within the meaning of the Fourth Amendment." *Id.* at 661. "A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). An officer's mission includes deciding whether to issue a traffic ticket and other "ordinary inquiries incident to [the traffic] stop." *Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015) (quoting *Caballes*, 543 U.S. at 408). These "ordinary inquiries" typically involve "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* A dog sniff, however, is "not fairly characterized as part of the officer's traffic mission" because it "is a measure aimed at detecting evidence of ordinary criminal wrongdoing." *Id*. (alteration omitted).

"Once the purpose of the initial traffic stop is completed, an officer cannot further detain the vehicle or its occupants unless something happened *during the stop* to cause the officer to have a 'reasonable and articulable suspicion that criminal activity [is] afoot.'" *United States v. Davis*, 430 F.3d 345, 353 (6th Cir. 2005) (quoting *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999)). In forming reasonable suspicion, officers may draw on their "experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 499 U.S. 411, 418 (1981)). While a "mere hunch" is not enough, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Id.* (citations omitted).

In deciding whether an officer developed reasonable suspicion of criminal activity, we consider the totality of the circumstances. *Stepp*, 680 F.3d at 664 (citing *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004)). The government, in establishing reasonable suspicion, cannot rely solely on "relatively minor" factors that are "'subject to significant qualification.'" *Stepp*, 680 F.3d at 665 (quoting *United States v. Bell*, 555 F.3d 535, 540 (6th

Cir. 2009)).  Here, the government maintains that the following factors collectively give rise to reasonable suspicion:

(1)     Driving behavior:  Calvetti's abrupt lane change, reduction of speed, and rigid, unnatural posture were "suggestive of a person trying not to be stopped";

(2)     Luggage:  The minivan contained very few belongings for someone who was relocating to a new state;

(3)     Minivan Ownership:  Calvetti first claimed to own the minivan, but when confronted with the fact that it was registered to someone else, she back-peddled, stating that she was still in the process of buying the van;

(4)     Hard travel:  Unlike any driver that Trooper Ziecina had pulled over in ten years, Calvetti was the first to state that she had been driving for 24 hours straight;

(5)     Nervousness:  Calvetti appeared unusually nervous, searching for answers to simple questions, not making eye contact, sweating, shaking, and deflecting the question of whether she was always this nervous by volunteering that she had already been stopped and searched on the trip; and

(6)     Criminal history:  Calvetti admitted that she had a prior misdemeanor drug conviction and Cortez had more than one prior drug conviction, smoked marijuana, and spent 18 years in prison for a drug offense.

In *United States v. Stepp*, we affirmed the district court's denial of the defendants' motions to suppress on the basis that the officers had reasonable suspicion to prolong a factually-similar traffic stop.  680 F.3d at 661–67, 672.  In that case, the government relied on five factors to support a finding of reasonable suspicion:  (1) nervousness, (2) the passenger pretending to be asleep but tightly gripping his cell phone, (3) the defendants' inability to produce a car rental agreement, (4) the defendants' travel plans were to train at a boxing gym, yet neither defendant could name the gym or its location, and (5) criminal history checks for both defendants revealed involvement in narcotics.  *Id.* at 658, 664.

Analyzing these considerations, we reiterated that nervousness was a relevant but "unreliable indicator, especially in the context of a traffic stop."  *Id.* (quoting *Richardson*, 385 F.3d at 630).  Similarly, we explained that feigning sleep and the defendants' inability to produce

their rental car agreement were weak indicators of criminal activity. *Id.* at 665–66. What remained were two stronger indicators: (1) "vague" or "dubious" travel plans, and (2) relevant criminal history. *Id.* at 666–67.

Regarding travel plans, we explained that our court has "placed weight on implausible travel plans in considering whether reasonable suspicion has arisen," such as when inconsistent explanations are offered. *Id.* at 666. In *Stepp*, the proffered travel plans were dubious because the occupants lacked knowledge of their final destination in a city that was less than an hour away, and demonstrated an inability to answer "relatively basic follow-up questions" about their plans. *Id.* Here, Calvetti's and Cortez's travel plans were also dubious; they had almost no luggage, despite claiming that they were relocating from one state to another, and that they had driven straight through from Texas to Michigan.

Regarding a suspect's criminal history, we cautioned in *Stepp* that "an officer's knowledge that a defendant has a criminal history is not enough to create a reasonable suspicion," even when combined with other weaker indicators, but we also distinguished the circumstances in that case. *Id.* at 667. In *Stepp*, like the instant case, "the criminal history reports . . . were specific and related to the same suspicions that the officer was developing—that the occupants of the vehicle might be involved in drug trafficking." *Id.* We thus concluded that "the specific nature of [the defendants'] criminal histories—involvement in narcotics—casts a suspicious light on the otherwise weak indicators, particularly when combined with the dubious travel plans." *Id.*

In light of *Stepp*, the enumerated factors in this case, when viewed in the light most favorable to the government, constitute reasonable suspicion of criminal activity. Although the government relies on several weak indicators of criminal behavior, it also relies on two strong indicators—Calvetti's and Cortez's dubious travel plans (driving twenty-four straight hours from Texas to Michigan with a small amount of luggage inconsistent with moving to a new state) and criminal histories (drug-related offenses). Taken together with Calvetti's nervousness, driving behavior, and her inconsistent statements as to whether she owned the minivan, these factors establish that the officers had reasonable suspicion necessary to justify expanding the initial stop in order to question Calvetti and Cortez further and to accommodate the minivan search.

III.

Calvetti also argues that there was insufficient evidence to support her drug trafficking convictions.  The government contends that the evidence of a recorded conversation between Calvetti and Cortez in the patrol car was sufficient.

"[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "Consequently, in raising a sufficiency of the evidence claim, a defendant 'bears a very heavy burden.'"  *United States v. Geisen*, 612 F.3d 471, 489 (6th Cir. 2010) (quoting *United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999)).

To sustain a conviction for conspiracy in violation of 21 U.S.C. § 846, the government must have proven beyond a reasonable doubt that:  (1) there existed an agreement to violate drug laws (in this case, an agreement to distribute cocaine in violation of 21 U.S.C. § 841); (2) defendant had knowledge of, and intended to join, the conspiracy; and (3) defendant participated in the conspiracy.  *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005). "Proof of a formal agreement is not necessary; a tacit or material understanding among the parties will suffice."  *Id.* (internal quotation marks and alteration omitted).  "The existence of a conspiracy 'may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan.'"  *Id.* (quoting *United States v. Avery*, 128 F.3d 966, 970–71 (6th Cir. 1997)).   "Once a conspiracy is shown beyond a reasonable doubt however, a defendant's connection to the conspiracy 'need only be slight.'"  *Id.* (quoting *Avery*, 128 F.3d at 971).  "Moreover, a defendant's knowledge of and participation in a conspiracy may be inferred from his conduct and established by circumstantial evidence."  *Id.* (citing *United States v. Salgado*, 250 F.3d 438, 447 (6th Cir. 2001)).

To sustain a conviction for possession with intent to distribute a controlled substance, the government must show beyond a reasonable doubt that the defendant: (1) knowingly (2) possessed a controlled substance (3) with intent to distribute.  *United States v. Coffee*, 434 F.3d 887, 897 (6th Cir. 2006).

Calvetti's argument applies to both counts of her conviction: there was insufficient evidence to prove that (1) she "consciously committed to a conspiracy to distribute cocaine"; and (2) "she knew there were drugs in the van" (3) "that Cortez planned to distribute." She maintains that she cannot be convicted for mere association with the conspirators, but focuses on just one statement she made to Cortez in the patrol car: "[Y]ou're going to say that it's yours, right? That I don't know anything . . . [t]hat it's your friend who sold . . . that thing and there was no way . . . no way I knew." While this statement alone does not prove that Calvetti had joined a conspiracy to traffic cocaine and knew there were drugs in the minivan that would be distributed, her argument fails to appreciate the remaining evidence against her and the permissible inferences that a jury may draw from that evidence.

At trial, the government presented evidence of drug packaging materials, including clear plastic wrap, tubes of grease, and dryer sheets, found in Calvetti's sparsely-furnished Dearborn Heights residence. The government also presented evidence of a conversation between Calvetti and Cortez recorded in the patrol car while the officers were searching the minivan. During this conversation, Calvetti and Cortez compared their responses to Trooper Ziecina's questions to see if they matched, including their responses about their travel plans and minivan ownership. Calvetti asked Cortez how they would know if the dog identified contraband and repeatedly asked him for updates on what part of the minivan the officers were searching. Calvetti also asked if "this thing" opens, and Cortez said "No, it doesn't open."

As the minivan search continued, Calvetti became more anxious: she wondered aloud if the patrol car had a recording device and told Cortez to speak in Spanish. She also told him, "I'm not doing this anymore. . . . Neither one of us"; and later asked him to "pray to your grandma. . . . ask your grandma to help us." When the officers began searching the minivan floor where the drugs were hidden, she told Cortez that he would have to take the blame if they find "it." Cortez agreed, assuring Calvetti that he would tell them that "it's" all his, that he used her, and that she does not know anything.

Shortly thereafter, they discussed their cell phones. Calvetti instructed Cortez to erase a number from his phone and said she would erase a number from her phone. Then, after Cortez accidentally called an unidentified man, Cortez told Calvetti to take the call when the man called

back and to say that the police are "searching the vehicle and everything's . . . is not looking good, that, uh, that they got two dogs." Calvetti then answered a call from the man—whose number was later identified as belonging to co-conspirator Yasiel Garcia—and said: "Hello. Hello. Look, we got pulled over again, they're searching everything. They already took down the chairs, so I don't know . . . I'm going to erase your [cell] . . . your number." She then told the man on the phone, "[it's] really bad. Right now really bad . . . [T]hey had brought the dog up . . ." Later, Calvetti explained to Cortez that the man on the phone "got nervous."

A jury could find beyond a reasonable doubt that Calvetti was a knowing participant with Cortez and Garcia in what she knew to be a conspiracy to transport and distribute drugs based on this circumstantial evidence. First, the conversation in the patrol car establishes that Calvetti and co-conspirator Garcia knew each other. When she spoke with Garcia on Cortez's cell phone, she did not have to introduce herself or otherwise explain the nature of the call; she simply advised Garcia that the situation was "really bad" and warned that the minivan was being searched by officers with a drug-sniffing dog. Calvetti then deleted Garcia's number and persuaded Cortez to take the blame if the drugs were discovered. This evidence establishes a link to the conspiracy that is well beyond the "slight" connection necessary to find Calvetti guilty.

Calvetti's specific argument that the evidence is insufficient to establish that she knew there were drugs in the minivan, as opposed to some other contraband, is also unconvincing. A jury could reasonably infer from the recorded conversation that Calvetti knew there was a special compartment in the minivan floor that Cortez had bought from a friend. Calvetti referred to the trap as "it" and asked Cortez whether it opened. As the search focused on the floor of the minivan, she told Cortez to pray to his grandmother for help and said she was "not doing this anymore . . . Neither one of us." Then, as they concocted a story for Cortez to tell the police, Calvetti told him to say that his friend sold her "that thing and there was no way . . . no way I knew." This suggests that she knew the trap was meant to hide contraband. Finally, Calvetti's constant preoccupation with the activity of the drug-sniffing dog, and her specific warning to Garcia about its presence, suggests that she knew there were hidden drugs. Indeed, there was no other contraband in the minivan that Calvetti would have been worried about the dog, or the police, detecting.

In support of her argument, Calvetti relies on three cases that are factually distinguishable. First, *United States v. Morrison*, 220 F. App'x 389 (6th Cir. 2007). In that case, the defendant allowed an alleged co-conspirator to store a car in his garage but there was no evidence that the defendant knew of the hidden drugs. *Id.* at 396–97. In this case, by contrast, there is circumstantial evidence to suggest Calvetti knew there was contraband in the minivan and additional circumstantial evidence that she knew the contraband was narcotics that could be detected by a drug-sniffing dog.

Second, Calvetti cites *United States v. Sliwo*, 620 F.3d 630 (6th Cir. 2010). But that case is distinguishable because the defendant merely served as a lookout and was never seen in the van where the drugs were uncovered. *Id.* at 638. In this case, Calvetti drove the minivan, admitted to being responsible for all of its contents, and circumstantial evidence supports that she knew there were drugs in the minivan but told Cortez to lie to the authorities about her involvement if the drugs were uncovered.

The final case is *United States v. Coppin*, 1 F. App'x 283 (6th Cir. 2001). As with Calvetti, the defendant in that case was never seen with the co-conspirators at the time the actual drug activities were taking place, and "one of the main targets of the investigation" testified that he had no knowledge of the defendant's involvement in the conspiracy. *Id.* at 291. For the same reasons that *Sliwo* is distinguishable, however, *Coppin* does not help Calvetti. The nexus connecting her to the drugs, while circumstantial, is much stronger.

In the present case, the jury could reasonably infer from Calvetti's comments and actions in the patrol car, and the evidence of drug packaging materials found at her residence, that she was actively involved in a drug trafficking conspiracy with Cortez and Garcia, and was aware of what she and Cortez were transporting in the minivan and that they were transporting it to her home for distribution. When viewed in a light most favorable to the government, this evidence is sufficient to support Calvetti's convictions.[4]

---

[4]Calvetti also argues that the government was required to prove that she knew the alleged conspiracy involved the type and quantity of drugs necessary to trigger the ten-year mandatory minimum for 21 U.S.C. § 841(b). She acknowledges, however, that our court held otherwise in *United States v. Dado*, 759 F.3d 550, 569–71

IV.

Finally, Cortez maintains that the district court should have credited him at sentencing for accepting responsibility by admitting to the DEA agents and testifying at trial that the cocaine was his. Because Cortez did not raise this issue below, either in his sentencing memorandum or at sentencing, we review for plain error. *United States v. Morgan*, 687 F.3d 688, 694 (2012).

A defendant who "clearly demonstrates acceptance of responsibility for his offense" is entitled to a two-level reduction to his offense level. U.S.S.G. § 3E1.1(a). The defendant must establish by a preponderance of the evidence that he is entitled to this reduction. *United States v. Bacon*, 617 F.3d 452, 458 (6th Cir. 2010). Typically, a defendant demonstrates acceptance of responsibility by entering a guilty plea. *United States v. Truman*, 304 F.3d 586, 592 (6th Cir. 2002). While a defendant who proceeds to trial is not automatically ineligible for an acceptance-of-responsibility reduction, such a defendant must fall into the rare situation where he "goes to trial to assert and preserve issues that do not relate to factual guilt" such as challenging the constitutionality of a statute. U.S.S.G. § 3E1.1 n.2. This is not that case.

Here, the government responds that Cortez testified at trial to protect Calvetti by concealing her involvement (as the two planned in the patrol car), rather than take responsibility for his actions, and contends that Cortez assisted the officers in opening the hidden trap because he did not want them to destroy it after he paid $25,000 to have it installed. Similarly, the government maintains that Cortez's cooperation was "half-hearted," as he agreed to participate in a controlled delivery but then tipped off the buyer about the presence of law enforcement, undermining the delivery. Cortez offers no reply and thus has failed to establish plain error.

V.

For these reasons, we affirm the judgment of the district court as to both defendants.

---

(6th Cir. 2014). We are bound by prior published decisions of this court. *United States v. Elbe*, 774 F.3d 885, 891 (6th Cir. 2014).

———————————

**CONCURRENCE**

———————————

SUHRHEINRICH, Circuit Judge, concurring.   While I agree with the majority, I write separately to highlight what I see as additional reasons to affirm the district court's decision regarding the duration of the traffic stop.

The majority opinion rightly examines whether Trooper Ziecina developed a reasonable suspicion to detain Calvetti and Cortez beyond the time needed to complete the purpose of the initial traffic stop.  I agree that the combination of facts discussed in the majority opinion could produce a reasonable suspicion of criminal activity.  But we must also consider whether Ziecina developed a reasonable suspicion *before* the expiration of time reasonably required to address the traffic violation.  *See Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015) ("An officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop.  But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual.").  If Ziecina developed a reasonable suspicion only after he had already "measurably extend[ed]" the stop by extraneous questioning, there would still be a Fourth Amendment violation.  *Id.*; *see Joshua v. DeWitt*, 341 F.3d 430, 446 (6th Cir. 2003) (noting that a petitioner's criminal history could not be considered as a factor supporting reasonable suspicion because the officer did not learn about the criminal history until he "had already verified that Petitioner was in lawful possession of the rental car and had already been detaining Petitioner without reasonable suspicion for quite some time").

In this case, the first fifteen minutes of questioning revolved around subjects recognized as incident to a traffic stop; Ziecina asked primarily about Calvetti's travel plans and the ownership of the minivan.  *See Rodriguez*, 135 S. Ct. at 1615 (checking driver's license, determining whether there are outstanding warrants, and inspecting the automobile's registration and insurance are ordinary inquiries incident to a traffic stop); *United States v. Stepp*, 680 F.3d 651, 662 (6th Cir. 2012) (inquiring about the driver's travel plans and authority to operate the vehicle is not extraneous questioning).  By the end of these first fifteen minutes, Ziecina had learned about Calvetti's irregular driving behavior, her nervous demeanor, the defendants'

unusual and unlikely travel plans, and the discrepancy in the minivan ownership—all factors contributing to a nascent reasonable suspicion.  At the end of this initial round of questioning, Calvetti also gave her consent to search the van, and the officers conducted an initial dog sniff of the van that did not result in any alerts.  After the dog sniff, Ziecina asked Calvetti more questions about the ownership of the van.  Ziecina then asked Calvetti about her and Cortez's criminal history—a subject matter not tied to the original purpose of the stop—and discovered that both of them had drug-related convictions.  This timing is arguably problematic because Ziecina did not learn about Calvetti's and Cortez's criminal history, one of the factors critical to the reasonable suspicion calculus, until immediately after he'd exhausted most of subjects related to the initial traffic stop.  Two points refute this argument.

The first point is that Ziecina did not engage in "unrelated checks" about the defendants' criminal history "in a way that prolong[ed] the stop."  *Rodriguez*, 135 S. Ct. at 1615. Immediately after concluding the traffic-related inquiries, Ziecina asked two brief questions about criminal history, the answers to which built upon his previous suspicions to grow into a reasonable suspicion.  *Stepp* exhibited similar on-the-cusp timing and it did not render the duration of the stop unreasonable, thereby justifying an extension of the stop.  In *Stepp*, the officer did not ask questions eliciting the passengers' dubious travel plans until he had already announced his intention to issue a warning ticket and began filling it out.  680 F.3d at 658.  Yet the court relied on the passengers' dubious travel plans as one of the factors justifying the prolonged detention.  *Id.* at 666.  Thus, it appears that if the last factor needed to create a reasonable suspicion arises around the same time that the traffic stop would otherwise come to its reasonable conclusion, there is no Fourth Amendment violation.  That is what happened here. Although Ziecina did not learn about Calvetti's and Cortez's criminal history until after he had covered most of the topics incident to the traffic stop, that was the last piece of the puzzle necessary to create a reasonable suspicion.  Ziecina's brief questioning about criminal history thus did not "measurably extend the duration of the stop," *Rodriguez*, 135 S. Ct. at 1615, because the answers revealing a criminal drug history completed Ziecina's developing reasonable suspicion at around the same time the traffic stop should otherwise have come to an end.

The second, more important point is that Calvetti and Cortez gave their consent to search the van within the first fifteen minutes of the traffic stop—a fact not present in either *Stepp* or *Rodriguez*, where the defendants denied officers' requests to search their car. We held in *United States v. Erwin*, 155 F.3d 818, 823 (6th Cir. 1998) (en banc), that a police officer does not violate the Fourth Amendment by asking for consent to search a person's vehicle, even if the tasks relevant to the traffic violation are complete and there is no reasonable suspicion that a crime has been committed. *See also United States v. Canipe*, 569 F.3d 597, 601-02 (6th Cir. 2009) (finding no Fourth Amendment violation where an officer asked for, and received, consent to search a vehicle *after* issuing a traffic citation). Although asking for consent to search could conceivably "measurably extend the duration of the stop" without the reasonable suspicion required by *Rodriguez*, 135 S. Ct. at 1615, the Supreme Court has held that officers are not required to have a reasonable suspicion to request consent to search a person's luggage as long as that person felt free to decline the officer's request. *Florida v. Bostick*, 501 U.S. 429, 433-37 (1991). The same reasoning applies to a person's motor vehicle. Neither Calvetti nor Cortez have argued that their consent to search the van was coerced or otherwise involuntary. Therefore, their consent to a search of the van roughly fifteen minutes into the traffic stop constitutes an additional reasonable basis for prolonging the traffic stop independent of the officers' reasonable suspicion of criminal activity.