NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0376n.06
No. 19-1603

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| *Plaintiff-Appellee*, | ) | **FILED**<br>Jun 24, 2020<br>DEBORAH S. HUNT, Clerk |
| v. | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| KENNETH GARDNER, | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| *Defendant-Appellant*. | ) | MICHIGAN |
| | ) | |
| | ) | |

**Before: BATCHELDER, STRANCH, and NALBANDIAN, Circuit Judges.**

**ALICE M. BATCHELDER, Circuit Judge.** A jury convicted Kenneth Gardner of carjacking, attempted carjacking, conspiracy to commit carjacking, and related firearm offenses. Gardner appeals his conviction, claiming that (1) there was insufficient evidence to support a verdict of guilty; (2) carjacking does not qualify as a "crime of violence" under 18 U.S.C. § 924(c); and (3) Congress lacked the constitutional authority to enact § 924(c). We find no merit in any of these claims and therefore **AFFIRM**.

**I.**

The conspiracy began at a Detroit strip club in August 2017. Gardner and Damon Washington were supposed to be working as doormen at the club and decided instead to rob its patrons. They hatched a simple plan: Gardner would rob the strip club patrons at gunpoint while Washington waited in a nearby getaway car. Washington purchased a gun—a pistol with a green laser sight—and the two began their venture, robbing at least ten people leaving various Detroit strip clubs.

In September 2017, the scheme evolved. Washington and Gardner joined forces with Veronica Sharp, a frequent patron of the MGM Grand Casino's high-limit room, and the three decided to focus on Detroit's casino clientele. They devised the "car-bumping" plan, which went like this: Washington and Sharp would identify a target and call Gardner when the target left the casino; Gardner, waiting outside in a stolen car, would follow the target and "bump" the target's car, causing a fake traffic accident; Gardner would then rob their target at gunpoint; and Washington and Sharp would arrive in time for the trio to escape with their spoils. The team proceeded to execute some version of this plan on at least nine different occasions.

Their first attempt failed. Washington and Sharp identified a man leaving a casino and Gardner followed him onto the highway. When Gardner bumped the man's car, he did not pull over as anticipated, and Gardner abandoned the chase.

Undeterred, the trio planned their next strike. On September 22, Washington and Sharp identified Xianhui Wu and his wife as the evening's victims. When the Wus left the casino in their Toyota Sienna van, Gardner followed the couple onto the highway in a stolen Jeep Cherokee. Washington and Sharp trailed behind in Washington's Dodge Charger. Washington called Gardner as they left the casino so the group could communicate during the robbery.

The Wus drove to their home, which was situated above a restaurant, and a security camera recorded Gardner as he approached the couple. Gardner pointed the gun with the green laser sight at the Wus and demanded their money, cell phones, and car keys. The Wus acquiesced, and Gardner drove away in their Toyota Sienna van. Washington, still on the phone, yelled that Gardner had "just caught a carjacking case" and directed him to abandon the stolen van. R. 94, Tr. Jury Trial Volume 7, PageID#: 1775. Washington picked Gardner up, and the trio split the proceeds from the robbery.

Two days after the Wu robbery, the team targeted Desean McCullough. This time, Washington, who was displeased that Gardner had carjacked the Wus, took the lead to show Gardner "how it was supposed to be done." R. 93, Tr. Jury Trial Volume 4, PageID#: 1674. When McCullough and a woman left the nightclub, Washington, who was driving, and Gardner followed in a stolen vehicle. Sharp trailed behind in Washington's Dodge Charger. Washington bumped McCullough's car and, brandishing his gun, ordered McCullough and the woman to hand over their belongings. Gardner grabbed the items off the ground; Sharp picked up her coconspirators, and the trio escaped.

The next robbery occurred a few days later. Gardner, driving a stolen Dodge Stratus, bumped a couple's car and robbed them at gunpoint. The proceeds from this robbery included only a few dollars and some stolen credit cards. The team used the credit cards to buy gas and drove to Toledo, Ohio, searching unsuccessfully for another victim. When they returned to Detroit the next morning, Gardner bumped and robbed Amy Thompson.

On September 26, the group targeted Lulu Rodriguez.[1] Still driving the stolen Dodge Stratus, Gardner bumped Rodriguez's Nissan Sentra; she pulled over and Gardner ordered her at gunpoint to leave her belongings in her car. Gardner drove away in the Nissan Sentra, abandoning the Dodge Stratus. Washington tried to convince Gardner that carjacking was unnecessary, but Gardner insisted that he could sell the carjacked vehicles, and Washington relented.

Although Sharp abandoned the scheme, Washington and Gardner carried on. On September 29, Washington and Gardner spotted John Falendysz and Vince Gerlando leaving a casino. Using the Nissan Sentra stolen from Rodriguez, Gardner bumped Falendysz's Chrysler 300. When Falendysz and Gerlando pulled over, they noticed Gardner's gun's laser beam pointing

---

[1] Sharp and Washington gave conflicting testimony as to whether Sharp quit the scheme before or after the Rodriguez robbery.

in their direction and handed over their belongings. Gardner jumped in Falendysz's Chrysler and drove away.[2]

Later, in the early hours of September 30, Washington and Gardner returned to the casino and targeted Mark Beltarri. As Beltarri left the casino in his Chevrolet Malibu, Gardner followed in a stolen sedan, and Washington trailed in his Dodge Charger. Gardner bumped Beltarri's Chevrolet, and upon exiting his car to inspect the damage, Beltarri saw Gardner's gun, panicked, and ran for the driver's seat. Gardner grabbed the car's front door, Beltarri resisted, and Gardner shot at his head, missing by eighteen inches. Beltarri immediately surrendered his valuables and watched as Gardner drove away in the stolen Chevrolet.

The surge of carjackings prompted Michigan police to investigate. The security footage from one of the casinos allowed officers to link the Dodge Charger to Washington and, after obtaining a warrant, to place a tracking device on Washington's car. On October 1, officers established surveillance. They observed Washington and Gardner follow Ann Wiseley as she left a casino and watched Gardner bump and approach her car. The officers rushed in to stop the imminent carjacking and Gardner threw his gun under Wiseley's car and tried to run away. Police arrested Gardner and recovered the gun, which was loaded with two bullets and equipped with a green laser sight.

The grand jury indicted Gardner on one count of conspiracy to commit carjacking, in violation of 18 U.S.C. § 371; four counts of carjacking and one count of attempted carjacking, in violation of 18 U.S.C. § 2119; five counts of using, carrying, and brandishing a firearm during and

---

[2] When Gardner carjacked the Chrysler, Falendysz still had the car's key fob in his pocket. So, while Gardner could drive the Chrysler temporarily, he would not be able to start the car again once he turned it off. Police found Falendysz's abandoned car the next day.

in relation to the carjacking, in violation of 18 U.S.C. § 924(c); and multiple counts of illegally possessing a firearm by a previously convicted felon, in violation of 18 U.S.C. § 922(g)(1).

A jury convicted Gardner on all counts. The district court denied Gardner's Federal Rule of Criminal Procedure 29 motion for judgment of acquittal and sentenced him to thirty-seven years in prison. Gardner timely appealed.

## II.

Gardner makes several sufficiency-of-the-evidence claims, arguing that the evidence did not show that he was part of a conspiracy, that he used or carried a firearm, or that he met the carjacking statute's specific-intent requirement of intent to cause death or harm. In reviewing these claims, we examine "the evidence in the light most favorable to the prosecution," asking whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Vichitvongsa*, 819 F.3d 260, 270 (6th Cir. 2016) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

## A.

Gardner claims that the government failed to introduce sufficient evidence to sustain his conspiracy conviction. The federal conspiracy statute, 18 U.S.C. § 371, requires the government to show: "(1) that the conspiracy was willfully formed and was existing at or about the time alleged; (2) that the defendant willfully became a member of the conspiracy; (3) that one of the conspirators knowingly committed an overt act; and (4) that the overt act was knowingly done in furtherance of the conspiracy." *United States v. McGahee*, 257 F.3d 520, 530 (6th Cir. 2001).

The government established that the conspirators planned an armed robbery scheme that evolved into a carjacking conspiracy. Gardner no doubt upped the ante when he carjacked the Wus without his coconspirators' assent. But the conspiracy continued, even though Washington

and Sharp knew that Gardner would continue to carjack their victims. Indeed, after the Wu carjacking, Gardner carjacked four more victims. A rational juror could infer that such conduct established that each conspirator, even if tacitly, agreed to the evolution of the scheme.

Gardner complains that there is no evidence proving the willful formation of a conspiracy because his coconspirators testified that they never planned to carjack their victims. But "[p]roof of a formal agreement is not necessary; a tacit or material understanding among the parties will suffice." *United States v. Calvetti*, 836 F.3d 654, 668 (6th Cir. 2016) (quoting *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005)). The government established proof of such an understanding among the coconspirators and, accordingly, Gardner's first claim fails.

**B.**

Gardner also contends that the evidence does not show that he used or carried a firearm during and in relation to the carjacking offenses.[3] *See* 18 U.S.C. § 924(c)(1)(A). Four of the firearm convictions corresponded to the completed carjacking offenses and all of the carjacking victims—the Wus, Rodriguez, Falendysz, Gerlando, and Beltarri—testified that Gardner threatened them with a gun when he demanded their vehicles. The government therefore established that Gardner "used" a firearm for purposes of § 924(c). *See Bailey v. United States*, 516 U.S. 137, 143 (1995), *superseded by statute*, Bailey Fix Act of 1998, Pub. L. No. 105-386, 112 Stat. 3469, *as recognized in Welch v. United States*, 136 S. Ct. 1257, 1267 (2016) (explaining

---

[3] The government contends that Gardner waived this argument by failing to assert it in his motion for a judgment of acquittal. But Gardner generally challenged the sufficiency of the evidence as to all of the charged offenses, albeit highlighting specific aspects of his claim. He therefore preserved the argument. *See United States v. Love*, 553 F. App'x 548, 553 (6th Cir. 2014).

that a conviction for "use" of a firearm requires evidence that the firearm was an "operative factor in relation to the predicate offense").[4]

The government also showed that Gardner "carried" a firearm during the attempted carjacking. *See Muscarello v. United States*, 524 U.S. 125, 136–37 (1998) (broadly interpreting § 924(c)'s carry provision). Police officers recovered Gardner's loaded gun after he threw it under Wiseley's car. That is enough to sustain the conviction. Gardner's arguments to the contrary simply ignore the overwhelming evidence against him.

## C.

Gardner's final sufficiency-of-the-evidence challenge is premised on the federal carjacking statute's specific-intent requirement, *see* 18 U.S.C. § 2119, which requires proof that the defendant, when taking a vehicle, had the "intent to cause death or serious bodily harm." *See United States v. Mack*, 729 F.3d 594, 603–04 (6th Cir. 2013). The government establishes intent if it shows that the defendant possessed "conditional intent" to kill or seriously harm a resisting carjacking victim, "even if the victim did not in fact resist and no attempts to inflict such harm were made." *United States v. Adams*, 265 F.3d 420, 424 (6th Cir. 2001) (citing *Holloway v. United States*, 526 U.S. 1, 10–11 (1999)).

This court applies a "brandishing-plus" test where the government has not shown that the defendant physically touched the victim or provided direct proof that the firearm was loaded. *United States v. Fekete*, 535 F.3d 471, 480–81 (6th Cir. 2008). In that case, circumstantial evidence showing that the gun was loaded or evidence indicating the defendant's conditional intent may satisfy § 2119's specific-intent requirement. *United States v. Washington*, 714 F.3d 962, 968–69 (6th Cir. 2013).

---

[4] The jury separately found that Gardner brandished the gun during the four carjackings and discharged the firearm during the Beltarri carjacking.

The government presented sufficient evidence from which a jury could reasonably infer that Gardner would have killed or seriously harmed resisting victims. Washington testified that he supplied Gardner with a loaded gun, which Gardner used to commit the carjackings. When police apprehended Gardner on October 2, they found that the gun he had thrown under Wisely's car was loaded. This evidence would allow a rational juror to infer that the firearm was loaded during each carjacking. *See id.* at 969; *Fekete*, 535 F.3d at 481–82. Moreover, Beltarri testified that Gardner had actually shot at him as Gardner robbed him and took his car—devastating proof not only that the gun was loaded during that carjacking but also of Gardner's conditional intent to kill or seriously harm any victim refusing to acquiesce to his commands. This insufficient-evidence claim therefore fails.[5]

### III.

Gardner claims that carjacking does not qualify as a "crime of violence" under § 924(c). Gardner failed to raise this claim in the district court, and we accordingly review for plain error, reversing only if there is (1) error, (2) that is plain, and (3) that affects substantial rights. *Mack*, 729 F.3d at 607.

Section 924(c)(3)'s "elements" clause[6] defines "crime of violence" as a felony that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." And the federal carjacking statute, 18 U.S.C. § 2119, provides that a person is guilty

---

[5] Gardner also suggests that the district court improperly instructed the jury on § 2119's specific-intent requirement. He points us to the government's first proposed jury instruction, which failed to properly state § 2119's specific-intent requirement. Gardner raised this objection below, and the government agreed, suggesting a new jury instruction that properly stated *Fekete*'s "brandishing-plus" test. *See* R. 95, PageID#: 1899–1903. The district court relied on the government's suggestion and correctly instructed the jury as to § 2119's intent element. R. 97, PageID#: 2022–23. Hence, the jury instruction that Gardner challenges on appeal was never given to the jury. This argument is simply frivolous.

[6] *United States v. Davis*, 139 S. Ct. 2319, 2323–24 (2019), invalidated § 924(c)(3)'s "residual" clause. Because carjacking is a crime of violence under § 924(c)'s "elements" clause, we need not analyze Gardner's residual-clause argument. *See United States v. Jackson*, 918 F.3d 467, 485 (6th Cir. 2019).

of carjacking when, "with the intent to cause death or serious bodily harm," a person "takes a motor vehicle . . . from the person or presence of another by force and violence or by intimidation."

Gardner argues that carjacking may be accomplished by nonphysical "intimidation." The carjacker might, for example, intimidate through verbal demands or a threatening note. But we have rejected this argument. *United States v. Jackson*, 918 F.3d 467, 486 (6th Cir. 2019) ("[W]e have held that bank robbery by intimidation necessarily involves the use, attempted use, or threatened use of violent physical force. Because the federal bank robbery and carjacking statutes use identical language, our precedent requires us to conclude—as have the Fourth, Fifth, and Eleventh Circuits—that the commission of carjacking by 'intimidation' necessarily involves the threatened use of violent physical force and, therefore, that carjacking constitutes a crime of violence under § 924(c)'s elements clause."). Our published holding in *Jackson* forecloses Gardner's claim. *See* 6 Cir. R. 32.1(b); *see also Harper v. United States*, 792 F. App'x 385, 389 (6th Cir. 2019); *Ovalles v. United States*, 905 F.3d 1300, 1304 (11th Cir. 2018) (per curiam), *abrogated on other grounds by Brown v. United States*, 942 F.3d 1069, 1072 (11th Cir. 2019) (per curiam); *United States v. Cruz-Rivera*, 904 F.3d 63, 66 (1st Cir. 2018); *United States v. Evans*, 848 F.3d 242, 247–48 (4th Cir. 2017); *United States v. Gutierrez*, 876 F.3d 1254, 1257 (9th Cir. 2017); *United States v. Jones*, 854 F.3d 737, 740 (5th Cir. 2017), *abrogated on other grounds by United States v. Smith*, 957 F.3d 590, 592 n.2 (5th Cir. 2020).

**IV.**

As a last resort, Gardner asserts a constitutional claim in his reply brief. He argues that Congress exceeded its powers under the Commerce Clause in enacting § 924(c) because the statute criminalizes conduct that lacks a jurisdictional nexus to interstate commerce. *Cf. United States v. Lopez*, 514 U.S. 549, 562 (1995).

There are two procedural problems with this claim. First, Gardner asserts that it is subject to de novo review because a "jurisdictional challenge may be raised for the first time on appeal[.]" Reply Br. at 3. True. But he confuses Congress's authority to legislate for a court's subject-matter jurisdiction. *See United States v. Al-Maliki*, 787 F.3d 784, 791 (6th Cir. 2015). Second, we do not entertain arguments raised for the first time in an appellant's reply brief. *Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010). We therefore do not review the merits of the constitutional claim.

## V.

For the foregoing reasons, we **AFFIRM** Gardner's convictions.