**UNITED STATES of America**
**Plaintiff–Appellee,**

v.

**Lanny Lorenzo COPPIN Defendant–Appellant.**

**No. 98–4173.**

United States Court of Appeals,
Sixth Circuit.

Jan. 5, 2001.

Before DAUGHTREY and CLAY, Circuit Judges; RUSSELL, District Judge.[*]

CLAY, Circuit Judge.

Defendant, Lanny Lorenzo Coppin, appeals from his conviction for conspiracy to possess cocaine with the intent to distribute in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846, and possession with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(ii), and 18 U.S.C. § 2. Defendant also appeals from the district court's imposition of a $5000 fine for both offenses pursuant to USSG § 5E1.2. For the reasons that follow, we REVERSE Defendant's convictions on both counts. It is therefore unnecessary to address the sentencing issue presented by the fine.

## BACKGROUND

On January 28, 1998, the Regional Narcotics Unit (RENU) officers, which included members of the Cincinnati Police Department and Hamilton County, Ohio Sheriff's Department, conducted an undercover operation involving the purchase of five kilograms of cocaine by an undercover officer, Agent Terrell Williams. According to Agent Williams, the targets of the investigation were Stanley Cross and Broderick Jackson, whom the RENU believed had been trafficking cocaine into Cincinnati for distribution. Officers of the RENU maintained surveillance on the Howard Johnson Motel (the "Howard Johnson") in Columbus Township, Ohio where they rented two rooms—one for surveillance and one for the undercover activity. On that morning, Agent Williams, his partner, Agent Valez, and the informant who arranged the purchase of the drugs met with Cross and Jackson. The parties discussed the transaction and arranged for the exchange of money and drugs to take place later that morning in the parking lot of the Howard Johnson.

After the initial meeting, Cross left the motel in a Chrysler LHS to retrieve the drugs. Cross was placed under surveillance and followed to the Residence Inn where he apparently retrieved the drugs to sell to the undercover agents. While at the Residence Inn, Cross met with Alfredo Rodriguez Garcia and Damien Forbes. Agent Ronald Reckers, one of the officers on the surveillance team, observed the three conversing as they walked out of the Residence Inn. Agent Reckers also saw Garcia place a blue bag into a Lincoln Navigator. The officer observed the Navigator leave the lot with Forbes driving and Garcia as a passenger. Cross, having received the drugs from Garcia and Forbes, was observed leaving the area. Agent Reckers testified at trial that he did not see Defendant at any point at the Residence Inn or elsewhere that day.

Cross returned to the Howard Johnson were he met with Jackson and Agents Williams and Valez. Agent Valez went to the Chrysler occupied by Cross, while Agent Williams, who had the money for the drugs, remained in another vehicle with Jackson. Cross gave the drugs, five kilograms of cocaine, to Agent Valez in a pillow case. When Agent Valez exited the vehicle, Agent Williams gave the money, $125,000, to Jackson and drove Jackson over to Cross' vehicle. As Cross and Jack-

[*] The Honorable Thomas B. Russell, United States District Judge for the Western District of Kentucky, sitting by designation.

son left the parking lot, RENU agents surrounded their vehicle, arrested Jackson and Cross, and confiscated the money.

Agent Williams testified at trial that Defendant was not the target of their investigation nor was he or his department aware of any involvement by Defendant with the drug trafficking scheme. He also testified that he did not see Defendant at any time before, during, or after the drug transactions that took place that day. Agent Williams further testified that Defendant's fingerprints were not found on the cocaine itself or the outside packaging of the cocaine.

Meanwhile, Agent Chris Conners had picked up surveillance of the Lincoln Navigator, occupied by Forbes and Garcia, as it left the Residence Inn. The Navigator traveled to the Budgetel hotel. Agent Conners observed Defendant walk to the passenger side of the Navigator and speak with Garcia for about a minute. Agent Conners next observed Defendant getting into a Mazda 929 with Alabama license plates. The two vehicles left the parking lot and traveled to downtown Cincinnati. Agent Conners lost surveillance of Defendant and the others when they reached downtown Cincinnati. At trial, Agent Conners testified that during his surveillance, he did not see any exchange of contraband, money, or any other object between Defendant and the others.

After learning that one of the subjects may have been staying at the Westin Hotel in downtown Cincinnati, Agent Conners went to the Westin to check the guest registry. While there, he ran into Dawn Viveiros and questioned her. He learned that Viveiros had driven the Navigator from Texas to Cincinnati for Levin Patchet.[1] Viveiros told agent Conners that she had previously driven the Navigator to various cities where an individual would retrieve the vehicle from her and return it to her later. Viveiros testified at trial that on one occasion Defendant and Rodriguez picked up the Navigator from her when she traveled to Atlanta for Patchet. Viveiros could not identify to whom she actually gave the keys of the vehicle or the dates of the event. Agent Conners also testified that Viveiros identified Defendant's phone number in her phone book.

In the interim, Agent Kevin Koo picked up surveillance of the Navigator and the Mazda 929 driven by Defendant. Agent Koo discovered the vehicles in the underground parking garage of the new Lazarus department store building. He kept the vehicles under surveillance until Defendant and Garcia walked out of the Lazarus building into the parking garage. The two men walked over to the Mazda 929 and talked for a minute or two. He also observed Defendant talking to someone on his cellular phone for a brief period of time. Agent Koo further testified that he saw Garcia place a Lazarus shopping bag into the Navigator. Both men departed— Defendant driving the Mazda 929 and Garcia driving the Navigator. As the men were leaving the garage, Garcia stopped at the parking attendant, got out of his vehicle and went to speak with Defendant, who was following in the Mazda 929. They spoke for a brief moment, Garcia returned to his vehicle and they proceeded to leave the garage, at which time both men were arrested. The agents found five kilograms of cocaine in the Navigator in a blue bag that had been placed in it earlier that day

1. Levin Patchet is a suspected drug dealer who the RENU believed supplied Broderick and Cross with the drugs the sold to the undercover agents on January 28, 1998. Viveiros told Agent Conners that she had driven that same Navigator to other states for Patchet under similar circumstances.

at the Residence Inn. No contraband was found in the Mazda.

Defendant was taken to the Criminal Investigation Section for the City of Cincinnati. Agent Koo testified that when he originally asked Defendant what he was doing in Cincinnati, Defendant responded that he came to Cincinnati to shop and that although he was driving the Mazda 929, he did not know who owned it.[2] Defendant also originally told Agent Koo that he did not know Garcia. Defendant eventually told Agent Koo that he did know Garcia, that he was asked by Garcia to help him drive from Atlanta, where Defendant and Garcia lived, to Cincinnati. Defendant explained that he met Garcia through a co-worker and that Garcia, who did not speak English, needed someone to translate for him while he was in Cincinnati. Defendant told Agent Koo that he only came to Cincinnati to shop.

Defendant also told agent Koo that he and Garcia arrived in Cincinnati around 5:30 a.m. on January 28. They stayed at the Budgetel motel. Defendant told agent Koo that when he woke up around 10:30 a.m., Garcia was not in the hotel, but the Mazda 929 that they drove to Cincinnati was still in the parking lot. Defendant stated that Garcia returned to the room around 1:00 p.m. with a man he did not know, later identified as Damien Forbes. Defendant stated that Garcia gave him the keys to the Mazda 929 and told him to follow them because they were about to go shopping. Agent Koo testified that Defendant did not have any drugs or drug paraphernalia in his possession.

At trial, Jackson testified that he recognized Defendant from the racetracks in Atlanta because Defendant repaired or maintained cars at the racetrack. He tes-

tified that he did not see Defendant in Cincinnati and that he understood that Defendant was not a part of the drug transaction that took place on January 28, 1998. Jackson further testified that on one other occasion, he was told by Damien Forbes to give money from an earlier drug deal to Garcia. He testified that when he met with Garcia, Defendant was driving the car for him. He testified that the fact that he was giving money to Garcia was not readily apparent because the money was in a container. He also testified that he understood that Defendant was only helping Garcia because he could not speak English.

Agent Kyle Ingram testified at trial that he examined the Defendant's telephone records and found that there had been phone calls made from Defendant's home phone and cellular phone to Patchet's cellular phone and Dawn Viveiros' cellular phone. Agent Ingram testified, however, that he could not discern from the phone records whether Defendant actually made or received any of these phone calls. The record also indicates that other individuals, particularly Garcia, had access to Defendant's cellular and home phones.

Defendant was arrested on January 28, 1998. A five-count indictment charged Defendant along with several other individuals[3] with violating certain drug laws. Defendant was charged under counts I and V of the indictment with (1) conspiracy "with intent to distribute and to distribute a Schedule II Controlled Substance, to wit; cocaine, in violation of the laws of the United States, 21 U.S.C. §§ 841(a)(1) and (b)(1)(A) [and 21 U.S.C. § 846];" and (2) "knowingly and intentionally possess[ing] with intent to distribute, a Schedule II

---

**2.** Agent Kyle Ingram testified that a bill of sale was found in the car with the name Levin Patchet on it. (J.A. at 166.)

**3.** All other co-defendants pled guilty.

Controlled Substance, to wit: more than 500 grams of cocaine ... [i]n violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(ii) and 18 U.S.C. § 2." (J.A. at 20–21, 23.) The indictment stated that the conspiracy occurred from on or about November 1, 1997 up to and including January 28, 1998.

On May 5, 1998, Defendant went to trial on both counts. On May 7, the jury returned a guilty verdict on both counts. On September 17, 1999, Defendant appeared for sentencing. In addition to a sentence of 120 months of imprisonment, five years of supervised release, and a $100 special assessment on each count due immediately, the court fined Defendant $2,500 for each offense for a total of a $5000 fine.

## STANDARD OF REVIEW

■ We review a challenge to sufficiency of evidence to determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *United States v. Kincaide*, 145 F.3d 771, 781 (6th Cir.1998) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). In making this determination, this Court refrains from weighing the credibility of witnesses or evidence. *See United States v. Welch*, 97 F.3d 142, 148 (6th Cir.1996). Moreover, " '[c]ircumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt.' " *United States v. Spearman*, 186 F.3d 743, 746 (6th Cir.1999) (quoting *United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir.1986)).

## ANALYSIS

### I.

■ Defendant first challenges his conviction for conspiracy to possess with intent to distribute cocaine. To sustain a conviction for conspiracy under § 846 the government must prove beyond a reasonable doubt (1) there existed an agreement to violate the drug laws and (2) that each co-conspirator knew of, intended to join, and participated in the conspiracy. *See United States v. Gaitan–Acevedo*, 148 F.3d 577, 586 (6th Cir.1998). For a conviction, the government must show that the defendant "agreed to participate in what he knew to be a joint venture to achieve a common goal." *Spearman*, 186 F.3d at 746. The agreement need not be actual or formal, but a tacit or material understanding among the parties is sufficient. *See United States v. Avery*, 128 F.3d 966, 970–71 (6th Cir.1997). Once the existence of a conspiracy is proven, only slight evidence is necessary to implicate a defendant. *See Kincaide*, 145 F.3d at 781. "Although only 'slight' evidence is needed to connect a defendant to a conspiracy, 'mere association with conspirators is not enough to establish participation in a conspiracy.' " *United States v. Gibbs*, 182 F.3d 408, 422 (1999) (quoting *United States v. Pearce*, 912 F.2d 159, 162 (6th Cir.1990)). "The distinction is especially important today when so many prosecutors seek to sweep within the drag-net of conspiracy all those who have been associated in any degree whatever with the main offenders." *Id.* (citation and quotation omitted).

Defendant argues that the evidence was insufficient to convict him of conspiracy to possess with intent to distribute cocaine. Defendant contends that the evidence failed to prove beyond a reasonable doubt that he had knowledge of and intended to join the conspiracy, that he made any agreement to violate the drug laws, or that he participated in any way in the conspiracy. Defendant further argues that at most the evidence only supports a conclusion

that he was present with and knew one of the members of the conspiracy.

■ We conclude that, after viewing the evidence in the light most favorable to the government, no rational trier of fact could find that the government proved beyond a reasonable doubt the essential elements of a conspiracy. Specifically, we conclude that the evidence is insufficient to support a conclusion, beyond a reasonable doubt, that Defendant agreed to participate in what he knew to be a drug operation. The government failed to produce any evidence of Defendant's intent or knowledge regarding the conspiracy. What the government has established is mere association. However, this Court has held that mere association is insufficient to "sweep [a defendant] within the drag-net of conspiracy." *Gibbs*, 182 F.3d at 422. We continue to adhere to this principle in arriving at our holding that the evidence is insufficient to support Defendant's conviction.

In essence, the government's evidence against Defendant consists of phone records and his relationship with Garcia. Beyond this, there is no evidence to connect Defendant to the conspirators or the conspiracy.[4] Significantly, none of the agents testified that they saw drugs or drug paraphernalia in Defendant's possession or Defendant exchange money or drugs with any of the members of the conspiracy. And Defendant told authorities that his only purpose in being in Cincinnati was to help Garcia, who could only speak Spanish, drive and to go shopping. In fact, the only time Defendant was seen with any of the

co-defendants in Cincinnati was when he followed Garcia and Forbes to the Lazarus department store and after Defendant and Garcia left the Lazarus department store, where Defendant was shopping—which was exactly what he said he came to Cincinnati to do.

This Court has consistently held that evidence of this type, which requires conjecture and inference upon inference, is insufficient to sustain a conviction for conspiracy. In *United States v. Pearce*, 912 F.2d 159, 162 (6th Cir.1990), this Court reversed a conviction for conspiracy, holding that the record was "devoid of any evidence that [the defendants] had entered into an agreement. [Defendant] Thorpe's mere presence in the house does not by itself demonstrate any tacit or mutual understanding between [the defendants]." The evidence before the Court in *Pearce* indicated that the police executed a search warrant at what they believed to be a "crack house." 912 F.2d at 160. Defendant Thorpe yelled, "[I]t's a bust" and ran to the basement as the police entered the house. *Id.* The police found Defendant Thorpe near an open floor drain containing two doses of crack. *See id.* They found a gun on the defendant's person and two guns near him. *See id.* The police also found Defendant Pearce sitting on a couch in the dining room. *See id.* The police found two bags lying next to Defendant Pearce—one containing marked police money from an earlier drug deal and 4.9 grams of crack in the other. *See id.* at 160–61. Defendant Thorpe claimed that

---

4. The government at oral argument stated that Defendant and Garcia were on the way to deliver cocaine to another buyer as they left the Lazarus garage. The government made this statement even though there is no evidence in the record to this effect, and the government admitted as much. Similarly, the government stated that Vivieros had, on previous occasions, given the keys to the Lin-

coln Navigator to Defendant while in Atlanta. The record, however, indicates that Vivieros testified that on one prior occasion Garcia and Defendant came to her hotel room and that she gave the keys to one of them. Contrary to the government's statement, Vivieros could not identify exactly to whom she gave the keys or when this activity took place.

he was in the house looking for someone who had beaten him so severely that he had to be hospitalized several weeks earlier. *See id.* at 160.

In concluding that there was no evidence of a tacit or mutual understanding among the defendants to violate the drug laws, the Court relied on the Fifth Circuit's decision in *United States v. Stanley*, 765 F.2d 1224 (5th Cir.1985), which reversed a jury's guilty verdict on a conspiracy count. In *Stanley*, just as in this case, the government relied on the fact that the defendant was with some of his co-defendants at the time of the arrest and that phone records indicated that there were calls made between phones belonging to the defendant and the alleged co-conspirators. *See Pearce*, 912 F.2d at 162 (citing *Stanley*). The court in *Stanley* found that despite these phone records, there was no evidence indicating that the Defendant had actually spoken with the other defendants. *See id.* The court reversed because, "on the basis of the record, 'the jury could not reasonably find that [the defendant] had the deliberate, knowing and specific intent to join the conspiracy . . . .'" *Id.* (quoting *Stanley*) (alteration in original).

A similar conclusion was reached by this Court in *Gibbs*, 182 F.3d at 408 (reversing a conviction for conspiracy because the evidence was insufficient). In *Gibbs*, the government charged the defendants with a drug conspiracy, whereby the defendants were alleged to have used force and the threat of force to keep rival drug dealers out of their neighborhood. *Id.* at 418–19. The government argued that because all of the defendants sold cocaine in the area, there was sufficient evidence to show a conspiracy. *See id.* at 422. This Court concluded that a conspiracy existed, but stated that the government needed to "present sufficient evidence to permit a jury to find that the specific defendants were connected to the agreement." *Id.*

The government must . . . point to evidence showing that a particular defendant had knowledge of the agreement to exclude non-resident drug dealers from [their neighborhood] and acquiesced in that agreement. The evidence must at least be sufficient that a reasonable juror could infer knowledge of and acquiescence in the agreement. Such an inference could be drawn from evidence showing at a minimum that a particular defendant was aware of a threat of unwanted competition from non-resident drug dealers and indicated that he had a stake in preventing such competition. Without this or similar evidence of knowledge and acquiescence in the type of agreement the government has alleged as the basis of this conspiracy, no reasonable juror could find that a particular defendant joined the conspiracy that existed here.

*Id.*

This Court's decision in *United States v. Wright*, 12 F.3d 215, 1993 WL 465164 (6th Cir. Nov. 10, 1993) *(per curiam)*, reversing a conviction for conspiracy, is also instructive. In *Wright*, the defendant, John D'Annunzio, had been charged with conspiracy to possess marijuana with the intent to distribute. 1993 WL 465164 at *1. D'Annunzio was a friend of another defendant who was convicted of conspiracy in the same case. *See id.* at *2. The government claimed that the defendant, D'Annunzio, was paid $1000 to "babysit" marijuana at his friend's home. *See id.* The government also claimed that D'Annunzio assisted his friend on more than one occasion when the friend delivered marijuana to a dealer, who pled guilty and testified as a witness for the government. *See id.*

The Court recognized the heavy burden the defendant had, but held that despite

that burden there was not sufficient evidence to sustain the conspiracy conviction. *See id.* at \*3. The Court found that although the defendant admitted house-sitting for his friend, he did not admit to receiving any money for it nor was he aware of marijuana being in the house. *See id.* The trial testimony only showed that a witness believed the defendant was paid for house-sitting, however, the witness did not pay him and had no knowledge of anyone else actually paying the defendant. *See id.*

The government also argued that the defendant had to have known that the marijuana was in the house because of the smell it emitted. *See id.* The defendant, however, stated that he had a cold and could not smell anything. The government put on no evidence to refute this explanation; nor did it show that defendant had been anywhere near the part of the house that contained the marijuana. *See id.* The government also presented a witness who testified that the defendant had accompanied his friend on other occasions when his friend made drug deliveries to the witness' home. *See id.* at \*4. The witness further testified, however, that the drug transactions took place in another room outside the presence of the defendant, but that they would all smoke marijuana socially afterwards. *See id.* The Court stated that "[d]espite the cooperation of this key witness, the government presented no evidence that [the defendant] ever saw any money or marijuana (other than the small amount smoked socially) or that the conspiracy or any drug deals were ever discussed in [the defendant's] presence." *Id.*

The government presented no evidence that [the defendant] knew about the drug deals that Wright and DeBono committed behind closed doors, much less that [the defendant] agreed to participate in these deals or join a larger

conspiracy.... "It is not enough for [the evidence] merely to establish a climate of activity that reeks of something foul." ... [The defendant's] presence at [the place where the marijuana was found] and his association with [a dealer] constitute evidence that supports the beginning of an investigation, not the beginning of a prison sentence.

*Id.* at \*4–5 (citations omitted).

The consistent principle in these cases is that conjecture and surmise regarding what a defendant may have intended or known is insufficient to support a conviction. The government is required to present evidence of the defendant's intent, knowledge of and agreement to join a conspiracy. Absent such evidence, the government's case will not succeed merely because there is something "fishy" about the defendant's conduct. We conclude that the conviction in this case is not supported by sufficient evidence, and can only be upheld if we were to engage in speculation and supposition—something we are not permitted to do.

■ As previously stated, the evidence that the government relies on shows presence and mere association at best. When Defendant was arrested, there were no drugs or drug paraphernalia on his person or in the Mazda 929, the only car in which he had been seen. Moreover, Defendant was never seen with any of the other co-conspirators at the time the actual drug activities were taking place. Furthermore, Jackson, one of the main targets of the investigation, stated that he had no knowledge of Defendant's involvement with the conspiracy. Although the government need not show that Defendant participated in every level of the conspiracy or that he knew everyone in the conspiracy, the government must nevertheless show evidence of knowledge of the conspiracy, and intent,

and an agreement to join the conspiracy— a burden the government has failed to meet. *See Gibbs*, 182 F.3d at 421–22.

The government's evidence against Defendant simply does not show knowledge. For instance, the government introduces phone records that indicate phone calls between Defendant's phone and Patchet's phone (one of the suspected drug suppliers). This evidence, however, does not show knowledge of or intent to join a conspiracy, let alone a tacit agreement. In fact, this evidence does not even prove that Defendant actually participated in any phone conversations with Patchet. Such evidence has been rejected as evidence tending to show knowledge of or intent to join a conspiracy to violate the drug laws. *See Pearce*, 912 F.2d at 162 (citing *Stanley*, 765 F.2d at 1243 ("although phone records seemed to indicate conversations between the defendant and the alleged co-conspirators, there was no evidence that the defendant had actually spoken with the other defendants") (reversing conviction for conspiracy)).

■ Likewise, the other evidence the government introduces is insufficient to show an agreement and knowledge of and intent to join a conspiracy. The government also introduced evidence which showed that Defendant had been present when Jackson, one of the conspirators, had given money to Garcia, another conspirator. Jackson testified, however, that it was not readily apparent that what he was giving Garcia was money and that he believed Defendant was only present to help Garcia because he did not speak English. The drug transaction, itself, did not take place in front of Defendant. The government presented no evidence to show that Defendant (1) knew that Jackson was giving Garcia money and (2) knew that the money was from a drug deal or that a drug deal had taken place. In this respect the

instant case is very similar to *Wright*, where the Court held that merely showing that Defendant may have been present when a drug deal took place, without showing that he knew that there was a drug deal taking place, is not sufficient evidence to show that the defendant had knowledge of or an intent to join a conspiracy. 1993 WL 465164, at *4.

The government may have proved that there was a conspiracy, but the government must still present sufficient evidence to show that this particular defendant knew of the objective of the conspiracy and agreed to join it. *See Gibbs*, 182 F.3d at 422. The government's evidence is lacking in this respect. In the instant case, although Defendant's explanations of his presence in Cincinnati and his relationship with Garcia may be unconvincing to the government, " '[i]t is not enough for [the evidence] merely to establish a climate of activity that reeks of something foul.' " *Wright*, 1993 WL 465164, at *4 (quoting *United States v. Wieschenberg*, 604 F.2d 326, 332 (5th Cir.1979)).

Again, as this Court stated in *Wright*, Defendant's association with Garcia and his presence in Cincinnati, however ill-advised, constitute evidence that should support the beginning of an investigation, not the beginning of a prison sentence. Moreover, the government failed to present any evidence to refute Defendant's explanation of his presence in Cincinnati. Therefore, there is insufficient evidence for a rational trier of fact to conclude beyond a reasonable doubt that Defendant knew of, intended to join, and participated in a conspiracy to possess cocaine with intent to distribute. *See, e.g., Gibbs*, 182 F.3d at 421–22; *Pearce*, 912 F.2d at 162.

## II.

■ Defendant next challenges his conviction for possession with the intent to

distribute cocaine on basis that the evidence was insufficient to sustain the conviction. To sustain a conviction for possession with intent to distribute cocaine, the government must show that a defendant "knowingly or intentionally" possessed the cocaine with intent to distribute. *United States v. Critton*, 43 F.3d 1089, 1095 (6th Cir.1995). Possession can be either actual or constructive. "Constructive possession requires that a person knowingly have power and intention to exercise control over an object." *Id.* at 1096. "Proof that the person has dominion over the premises where the [item] is located is sufficient to establish constructive possession." *Kincaide*, 145 F.3d at 782 (citation and quotation omitted). Moreover, a defendant aids or abets the commission of a crime if he associates himself in some way with the venture such that his participation is intended to bring about the crime or make it succeed. *See United States v. Clark*, 928 F.2d 733, 736 (6th Cir.1991).

■■■■ Defendant challenges his conviction for possession asserting that the evidence was insufficient to show that Defendant had knowing actual or constructive possession of the cocaine. Defendant also argues that the evidence was insufficient to sustain a conviction for aiding and abetting possession. We agree.

In the instant case, there is clearly no evidence of actual possession by Defendant. He was never in the vehicle that contained the drugs. Furthermore, there were no drugs found on his person or in the vehicle that he was driving. Therefore, the government's case rests on the existence of constructive possession.

There is also insufficient evidence to show that Defendant constructively possessed the cocaine with intent to distribute. Here, the cocaine was actually found in two different locations—five kilograms in the Navigator and five kilograms in the

possession of Cross that was presumably taken from the Residence Inn Hotel or the Navigator. The question now becomes whether Defendant exercised dominion and control over these locations.

In cases where this Court has found constructive possession, the defendant was generally present in the area. *See e.g., Critton*, 43 F.3d at 1095–96 (holding that defendant had constructive possession of drugs found in van because defendant was in van, it was accessible to all inhabitants, van was not compartmentalized, and drugs were found under seat in which defendant was sitting). In other cases, the defendant owned or rented the place in which the drugs were found. *See e.g., United States v. Hill*, 142 F.3d 305, 311 (1998) (upholding conviction for possession where drugs were found in defendant's home and in his specific living quarters); *United States v. Gholston*, 10 F.3d 384, 389–90 (6th Cir. 1993) (upholding conviction for possession where drugs were found in apartment paid for by defendant and defendant had keys to apartment). Still other cases have involved situations where the defendant had personal items located in the area where the drugs were found, indicating that the location was readily accessible to him. *See e.g., United States v. Simpson*, 191 F.3d 454, 1999 WL 777348 (6th Cir. Sept. 21, 1999) (upholding conviction for possession where drugs were found in locked glove compartment of car along with defendant's wallet). Courts have also upheld convictions where the defendant had access to the area in which the drugs were found and was in actual physical possession of drug paraphernalia. *See e.g., Hill*, 142 F.3d at 311.

The present case is unlike any of these cases because there is no evidence that Defendant had dominion or control over the Navigator or any hotel room in the Residence Inn. First, Defendant was never

seen in the Navigator or near the Residence Inn. Furthermore, none of Defendant's possessions were found in the Navigator. There was no evidence that showed that Defendant had a key to the Navigator or that the Navigator belonged to Defendant. In fact, there was no evidence to show that Defendant was anywhere near the cocaine that Cross sold to RENU agents. Defendant told police that he was in his hotel room at the Budgetel until around 1:00 p.m., after the drugs had already been delivered to Cross and to the RENU agents. The government has presented no evidence to refute this statement. And finally, there were absolutely no drugs or drug paraphernalia found on Defendant's person or in the vehicle he was driving. That Defendant knew the person who was driving the Navigator is insufficient to prove that he had dominion or control over the Navigator, or was aware that the Navigator was being used as an instrumentality of a crime. We therefore conclude that no rational trier of fact could find beyond a reasonable doubt that Defendant had either actual or constructive possession of the cocaine found in either place and his conviction for possession is hereby reversed.

Similarly, the possession conviction may not be sustained under the theory of aiding and abetting. In the instant case, the government presented no evidence to show that Defendant associated himself with the drug transactions that took place, let alone that he intended to make or help them succeed. First, as discussed above, there is no evidence that Defendant had knowledge of the drug transactions. Moreover, Defendant was not in the possession of drugs nor did he transport the drugs. At most, the government has shown that Defendant helped Garcia drive to Cincinnati. But there is no evidence that Defendant knew that Garcia was traveling to Cincinnati to participate in a drug deal. In the absence of evidence showing that Defendant knew of the criminal venture, the government cannot prove that Defendant intended to make the criminal venture succeed. In this case, the evidence is insufficient to support a conviction for aiding and abetting and no rational trier of fact could have concluded that Defendant knew of the criminal venture and acted in such a manner as to make the criminal venture succeed. *See United States v. Longoria,* 569 F.2d 422, 425 (5th Cir.1978) ("Proof that a defendant was merely associated with a criminal, or that defendant was present at the scene of a crime is not, without more, sufficient to sustain a conviction for aiding and abetting a criminal venture.").

## CONCLUSION

Accordingly, we REVERSE Defendant's judgment of conviction and sentence for conspiracy to possess cocaine with the intent to distribute and possession of cocaine with the intent to distribute.