NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0423n.06

No. 18-5548

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jul 21, 2020
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| HECTOR SALAS, JR., aka Hector Salas-Pina, | ) | DISTRICT OF KENTUCKY |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE: GUY, BOGGS, and WHITE, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** Defendant-Appellant Hector Salas, Jr., appeals the district court's denial of his motion to suppress, arguing that a dog sniff that led to the discovery of cocaine was unconstitutional. He also appeals his convictions of conspiracy to distribute controlled substances and possession with intent to distribute controlled substances, arguing that the government presented insufficient evidence of his guilt. Thirdly, Salas appeals his above-Guidelines sentence as substantively unreasonable. We AFFIRM.

**I.**

A.

The investigation that led to Salas's arrest began in January 2017, when FBI Special Agent Michael Van Aelstyn learned that a money courier would be meeting with an undercover agent in Lexington, Kentucky for a large-scale cash delivery. Agents identified the money courier as Talia Ramos. They surveilled her during the next pickup on April 14, 2017, and observed her drive to

a house on Sequoia Drive (the Sequoia House) and receive a large plastic bag from Eric James. They then conducted a traffic stop of Ramos and discovered a bag with approximately $300,000 cash in her vehicle. From this point forward, Ramos cooperated with officers by acting as a confidential informant (CI) for the ongoing investigation.

Ramos told Van Aelstyn that the Sequoia House was owned and occupied by Ansar McIver and alerted Van Aelstyn of an expected drug delivery to take place on April 26 at James's mother's house (the Shropshire House).[1] On that date, video and audio surveillance revealed that Ramos met the load drivers at Aguascalientes, a local grocery store, where one of the drivers asked her if she "had a place where they could work because he said the drugs were in the trailer, and they needed a covered place to take it out." R. 212, PID 1446. The drivers operated a truck with an attached trailer. Ramos led the drivers to the Shropshire House, where Ramos observed numerous individuals working to remove drug packages that were concealed in the axle of the attached trailer.

Ramos later alerted Van Aelstyn to another drug delivery expected on May 9. This time, Ramos met the load driver at a Motel 6 before leading him back to the Shropshire House. Once at the house, Ramos observed the driver remove concealed drugs from hidden compartments in the vehicle's wheel wells.

On May 18, Van Aelstyn received a call from Ramos about yet another load of narcotics being delivered. This third tip is what eventually led to Salas's arrest. According to Ramos, a load driver, whom she did not know at the time, contacted her to disclose that he would soon arrive

---

[1] Ramos testified that, in her role as a money courier, she would receive large cash deliveries to transport from both McIver and James. McIver and James provided Ramos with a cell phone for her to contact the individuals to whom she was delivering money. Ramos was paid $5,000 for each delivery. McIver also provided Ramos with the phone number of an unknown person in Mexico. This individual would contact Ramos to inform her of incoming shipments of drugs and help coordinate her deliveries. Ramos knew that her money deliveries were related to narcotics activity because she had seen and assisted with packaging drugs in the Sequoia House. At one point during the investigation, McIver gave Ramos a package of drugs to hold, which officers tested and determined was heroin.

in Lexington for a delivery. Ramos testified that she and the unknown caller agreed to meet at Aguascalientes. Upon arriving at the store, Ramos discovered the individual she had been coordinating with over the phone was Salas, who waved at her from the passenger seat of a gold Jeep. The Jeep had an attached trailer, similar to the one used in the first drug delivery, with a large air compressor on the back of the trailer. Ramos then instructed Salas to follow her back to the Shropshire house. Ramos did not have any contact with the Jeep's driver, Gerardo Mejia-Palacio.

After receiving the initial tip from Ramos, Van Aelstyn had assembled members of the Lexington Safe Streets Task Force, an FBI-led joint operation between federal, state, and local law enforcement, to try to prevent the narcotics from reaching their final destination. Ramos now informed Van Aelstyn of the Jeep's description. Once Ramos left the Aguascalientes with Salas and Mejia in tow, multiple officers followed behind the Jeep to conduct further surveillance. Van Aelstyn stated that "we followed along until we noticed some traffic violations occurring." R. 211, PID 1296.

The traffic stop that led to Salas's arrest was carried out by Officer Kevin Duane of the Lexington Police Department. Duane initiated the stop shortly after observing that the Jeep's trailer lacked functioning brake lights and that Mejia had changed lanes without signaling. Once Mejia pulled over, Duane observed that the Jeep and trailer both had Tennessee license plates. As with any traffic stop, Duane first approached the driver—Mejia in this case—to obtain identification, registration, and proof of insurance. Duane also requested identification from Salas, who was still seated in the passenger seat. Mejia presented an Arizona driver's license, and Salas presented a California identification card. According to Duane, the three different locations on the

plates and identifications aroused suspicion because "[Salas and Mejia] both were coming from states that [are] know[n] to be source states for illegal narcotics." R. 206, PID 1053.

Duane next questioned Mejia and Salas about their intended destination, with both responding that they were heading to their aunt's house to conduct drywall work. When questioned further, Mejia stated that the aunt lived in downtown Lexington, but that he was unsure of the exact address. Nor could Mejia name any neighborhood or area in which the aunt lived apart from the general description of "downtown." *Id.* at PID 1052. Duane estimated that this initial conversation with Mejia and Salas lasted two or three minutes.

These interactions heightened Duane's suspicion for several reasons. First, Duane thought that Mejia and Salas's response to his question about their destination sounded rehearsed because they both responded simultaneously and with the exact same wording. Duane also found it strange that neither Mejia nor Salas, despite being pulled over just minutes away from their aunt's downtown home, could provide more specific information about their destination. Finally, Duane, who had personal experience with contracting and drywall work, was suspicious of the lack of any tools or equipment in the vehicle with which to perform such work. Duane testified that, in his experience, most people doing drywall work bring at least some tools with them. Yet Duane also acknowledged that the tools could have been waiting at the job site and that air compressors can be used for certain types of drywall and construction work.

After the initial questioning, Duane returned to his vehicle and spoke with Kenneth Leavell, a K-9 handler with the Kentucky State Police. Leavell was on site with the dog to provide support for the investigation; he was initially parked beside Duane before they started following the Jeep. After speaking to Leavell, Duane returned to the Jeep and asked Salas and Mejia to step out of the

vehicle for additional questioning, and Leavell explained to Salas and Mejia that he would conduct a dog sniff.

As Leavell presented the dog to the vehicle, Mejia admitted to having some "personal use" narcotics in the vehicle's sunglass compartment. *Id.* at PID 1059. Duane then began searching the vehicle's interior and found three bags of suspected cocaine: one postage-stamp-sized bag in the sunglass compartment, a similarly sized bag in the center console, and another, larger bag in the center console that Duane estimated at roughly one-half ounce. Once this suspected contraband was recovered, Duane placed both Salas and Mejia under arrest, and they were transported away from the scene shortly thereafter.

Because the dog signaled the possible presence of narcotics at the driver-side door and underneath the trailer, officers continued searching both the vehicle and trailer. After Duane and other officers secured a search warrant, they moved the vehicle to a more secure location to complete the search. Officers then discovered roughly 6.5 kilograms of cocaine hidden in the trailer's axle. Duane estimated that the entire stop, up to the completion of the dog sniff, lasted roughly twenty minutes. In comparison, Duane testified that his normal traffic stops usually take between fifteen and twenty minutes.

At trial, Mejia testified that his involvement in these events began several months before his arrest, when Salas inquired whether he wanted to make money on an out-of-town construction job. (They were in Arizona at the time.) Mejia then purchased a trailer—the same one in which drugs would later be discovered—using money from Salas. The two subsequently traveled together to a home in Memphis, Tennessee, where they stayed for about a week doing non-specialized drywall and framing work. The Jeep was sitting in the driveway when Salas and Mejia arrived at this Memphis home. Mejia registered the Jeep and trailer under his name using the

Memphis home's address.  Salas paid for both registrations.  Salas also provided Mejia with money to open a bank account in Tennessee, which he needed to register the Jeep.  Mejia drove the Jeep back to Arizona, but Mejia and Salas left the trailer in the Memphis home's garage.

Salas contacted Mejia again in May about another unidentified "job" in Memphis.  R. 213, PID 1649–50.  According to Mejia, he and Salas traveled together to Memphis the second time to "set up to go to Kentucky," though Mejia stated he was unaware of any details other than "to go to Kentucky and show up." *Id.* at PID 1650–51.  During the trip to Lexington, Salas paid for all gas and hotel expenses, and he purchased the air compressor.  Salas also told Mejia where to drive.  Concerning the traffic stop, Mejia testified that Salas was the one who came up with the story about helping an aunt with drywall.  Mejia further asserted he had no knowledge of the drugs in the trailer until the search revealed their presence.

Ramos testified that she spoke on the phone with Salas again after Salas and Mejia were pulled over but before they were arrested.  Salas instructed Ramos to wait near the scene and be prepared to corroborate Salas and Mejia's story about doing work at an aunt's house, if he called again.  Salas also asked Ramos to send him an address that he could tell the officers was his destination.

## B.

Following his arrest, Salas was charged in a third superseding indictment with conspiracy to distribute five kilograms or more of cocaine, one kilogram or more of heroin, and 400 grams or more of fentanyl, in violation of 21 U.S.C. § 846 and 21 U.S.C. § 841(a)(1); possession with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 841(a)(1); and unlawful reentry into the United States, in violation of 8 U.S.C. §§ 1362(a) and (b)(2).  On Salas's motion, the district court ordered that the immigration charge be tried separately.

Salas filed a motion to suppress all evidence obtained from the May 18 vehicle seizure and search, arguing that "there was no reasonable suspicion to continue the traffic stop and therefore . . . the prolonging of the stop [to conduct a dog sniff] was a violation of [Salas's] Fourth [Amendment] rights."  R. 18-1, PID 48.  After a hearing, the magistrate judge recommended denying Salas's motion, concluding that the initial stop was appropriate because the officers' observations of the vehicle's inoperable brake lights and failure to signal provided the necessary probable cause for stopping the vehicle for regulatory violations; and  alternatively, the initial stop was proper because the officers had reasonable suspicion of criminal activity based on the ongoing drug investigation.  On the latter point, the magistrate judge explained:

> The FBI knew a) the circumstances of the prior like delivery, which involved the CI; b) the FBI deemed the CI truthful and reliable; c) the CI had information of a large delivery; d) the CI confirmed [the] load arrival, identified the vehicle, and had direct contact with the delivering actors; e) authorities confirmed the contact and the vehicle at the location indicated by the CI; f) the vehicle, including the occupants and the trailer involvement, matched the type of delivery previously encountered and was headed toward the suspected drop location. All of this, in combination, supported an investigative stop with or without the justificatory traffic-law breaches.

R. 41, PID 212.

The magistrate judge further noted that "[o]nce the stop occurred, Duane secured additional information strongly signaling further cause for suspicion and continuing scrutiny."  *Id.*  The magistrate judge noted in particular Salas and Mejia's long travel from drug-source locations, their lack of tools for the purported drywall work, their lack of an address for the destination, and the rehearsed nature of their responses.

As to any unconstitutional delay resulting from the dog sniff, the magistrate judge noted that the sniff added little time, if any, to Duane's typical traffic-related stop duration.  The magistrate judge further stressed the "critical" factor that the stop was not merely related to traffic

violations, but rather "the real focus of the day was the expected narcotics load." *Id.* at PID 214. Based on officers' reasonable suspicion of the drug activity, "any slight delay in activating [the dog] [was] of no moment." *Id.*

Salas objected to the recommendation, disputing that the stop was independently supported by reasonable suspicion of drug activity where "[t]he officers relied primarily on the word of an unidentified CI in suspecting [him] of being involved in narcotics activity." R. 42, PID 218–19. Salas further argued that, even if the dog sniff did not result in a significant delay, the stop was still impermissibly extended because the officers' inquiries—particularly the dog sniff—were not sufficiently related to issuing traffic citations. The district court overruled the objections, adopted the magistrate judge's report and recommendation, and denied Salas's motion to suppress.

Salas proceeded to trial and was found guilty of both drug offenses. Following the verdict, Salas pleaded guilty to the unlawful-reentry count. The United States Probation Office prepared a Presentence Investigative Report (PSR) that calculated Salas's base offense level as thirty-two. The PSR's proposed base offense level was largely based on the quantity of drugs involved in the overarching conspiracy: 6.1252 kilograms of cocaine recovered from the vehicle, and one kilogram of heroin and 786.6 grams of fentanyl recovered from the Sequoia House. A total offense level of thirty-two and a criminal history category of I resulted in a Guidelines range of 121 to 151 months. Salas objected to the PSR's drug-quantity and base-offense-level determinations, arguing that inclusion of the heroin and fentanyl quantities was unwarranted because "the record contains no evidence establishing that he had any involvement in the conspiracy prior to the May 18, 2017 trip." R. 190, PID 865.

At Salas's sentencing hearing, the district court noted that "we don't know what [Salas] knew about the conspiracy overall and if he knew other substances had been delivered previously"

and that a "void" existed in the record regarding Salas's involvement prior to May 18. R. 224, PID 1893. Accordingly, the district court sustained Salas's objection, resulting in a base and total offense level of thirty. Because the drug counts carried a mandatory minimum sentence of ten years' imprisonment, Salas's Guidelines range was 120 to 121 months.

The district court imposed an above-Guidelines sentence of 127 months' imprisonment. The district court explained that a modest upward variance was appropriate due to Salas's recruitment of another person to participate in the criminal activity, his leading role in the May 18 delivery, his contacts with others higher up in the conspiracy, and his unlawful reentry into the United States.

Salas now appeals.

## II.

Salas first argues that the district court erred in denying his motion to suppress. In addressing this challenge, we "review findings of fact for clear error and legal conclusions de novo," viewing "all evidence in a light most favorable to the Government." *United States v. Lott*, 954 F.3d 919, 922 (6th Cir. 2020) (internal quotation marks and citations omitted).

The Fourth Amendment generally protects individuals from warrantless searches or seizures. U.S. Const. amend. IV. In the context of vehicle stops, however, officers may stop a vehicle with probable cause to believe a traffic violation or other civil infraction was committed, or where the stop is supported by reasonable suspicion of criminal activity. *United States v. Collazo*, 818 F.3d 247, 253–54 (6th Cir. 2016).

Probable cause for a traffic stop is established when "an officer observes a motorist violate a traffic law"; the officer's subjective intent for making the stop is irrelevant. *Lott*, 954 F.3d at 922–23 (citations omitted). Reasonable suspicion is less demanding than probable cause, but "is

more than an ill-defined hunch; it must be based upon a particularized and objective basis for suspecting the particular person of criminal activity.'" *Collazo*, 818 F.3d at 257 (quoting *United States v. Shank*, 543 F. 3d 309, 313 (6th Cir. 2008)). An officer therefore "must point to specific and articulable facts supporting his suspicion." *Id.* (quoting *United States v. Perez*, 477 F. App'x 337, 341 (6th Cir. 2012)). Whether there is reasonable suspicion depends on the totality of the circumstances, and we view the evidence "using a common sense approach, as understood by those in the field of law enforcement.'" *Id.* (quoting *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004)).

When an officer conducts a simple traffic stop, the officer's permissible actions and the stop's duration both are limited by the "mission" of the stop. *Lott*, 954 F.3d at 923 (citing *Rodriguez v. United States*, 575 U.S. 348, 354 (2015)). Specifically, "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's mission—to address the traffic violation that warranted the stop and attend to related safety concerns." *Id.* (internal quotation marks and citation omitted) (quoting *Rodriguez*, 575 U.S. at 354). "'Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed;' whichever comes first." *Hernandez v. Boles*, 949 F.3d 251, 256 (6th Cir. 2020) (quoting *Rodriguez*, 575 U.S. at 354). Tasks ordinarily associated with a traffic stop that do not unconstitutionally extend a stop include checking identification, verifying registration and proof of insurance, and checking for any outstanding warrants on those in the vehicle. *Lott*, 954 F. 3d at 924 (citing *Rodriguez*, 575 U.S. at 355).

A dog sniff, in contrast, is not a task incident to ordinary traffic stops, but rather is an effort "aimed at 'detecting evidence of ordinary criminal wrongdoing.'" *Id.* (quoting *Rodriguez*, 575

U.S. at 355). An ordinary traffic stop, therefore, cannot be extended to accommodate a dog sniff without reasonable suspicion of criminal activity. *Id.*

Salas argues that the Supreme Court's recent decision in *Rodriguez*, 575 U.S. 348, shows that the dog sniff was unconstitutional because "[t]he only question . . . is whether Officer Duane at any point ceased diligently pursuing the true purpose of the stop." Appellant's Br. at 24. Salas asserts that "Duane conducted a routine traffic stop . . . [and] deviated from the purpose of the stop by approaching . . . Leavell . . . [and] unnecessarily extend[ing] the length of [the stop] to ensure that a dog sniff occurred." *Id.* at 23. Thus, according to Salas, "Duane's temporary abandonment of the stop's 'mission' undeniably prolonged Mr. Salas's detention in violation of his constitutional rights." *Id.* at 24 (quoting *Rodriguez*, 575 U.S. at 357).

*Rodriguez* is readily distinguishable. Although the present case and *Rodriguez* both involved traffic violations, in *Rodriguez* there were no underlying circumstances beyond the traffic violation itself to justify the stop that eventually led to a dog sniff. *See* 575 U.S at 351–53. The Court's holding makes the significance of this distinction particularly clear: "[a] seizure *justified only by a police-observed traffic violation* . . . 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete [the stop's] mission' of issuing a ticket for the violation." *Id.* at 350 (second alteration in original) (emphasis added) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). Further, the Court narrowly defined the issue in *Rodriguez* as "whether police routinely may extend an otherwise-completed traffic stop, *absent reasonable suspicion*, in order to conduct a dog sniff." *Id.* at 353 (emphasis added) (citation omitted). Thus, even if minor delays to conduct a dog sniff are unconstitutional for routine traffic stops, officers may still extend a stop to conduct a dog sniff when such action is supported by reasonable suspicion of criminal activity. Several cases from this court, all decided after *Rodriguez*, support this interpretation. *See, e.g.,*

*United States v. Calvetti*, 836 F.3d 654, 667 (6th Cir. 2016) (holding that the traffic stop was not improperly prolonged given defendants' suspicious travel plans, inconsistent story, and criminal history of drug offenses); *Collazo*, 818 F.3d at 259 (holding that further investigation was justified because the passenger's admission to purchasing prescription drugs from a relative established a reasonable suspicion of criminal activity); *Lott*, 954 F.3d at 925 (finding the officer had reasonable suspicion to prolong the stop due to the defendant's admission to having marijuana in the vehicle).

Given this landscape, we need not address Salas's argument that a slight delay to conduct a dog sniff during a routine traffic stop is unconstitutional, because the district court correctly determined that Duane had reasonable suspicion that Mejia and Salas were transporting illegal drugs and that the dog sniff was constitutional on that basis. Contrary to Salas's argument, this was not a simple "routine traffic stop," Appellant's Br. at 23, but rather arose out of an extensive investigation into an ongoing drug enterprise. This was the third in a series of large-scale drug transports. The CI, whose information had been reliable in the past, informed officers of a pending drug delivery and provided the vehicle's description prior to the stop. The circumstances of this delivery were also substantially similar to the prior deliveries on which the CI reported. Based on these prior investigative actions, Duane had reason to suspect criminal activity even before the stop occurred. *See Bazzi v. City of Dearborn*, 658 F.3d 598, 604–05 (6th Cir. 2011) ("[A]n informant's veracity, reliability and basis of knowledge are all highly relevant in determining the value of [the informant's] report." (alterations in original) (internal quotation marks omitted) (quoting *Illinois v. Gates,* 462 U.S. 213, 230 (1983))).

Duane also presented numerous "articulable facts" from the stop itself to further justify his suspicion of drug activity: Duane identified Salas and Mejia's travel from drug-source states, their lack of tools for standard drywall work, their inability to provide even an approximate destination,

and their seemingly rehearsed responses as all reinforcing his suspicion of criminal activity. Although these facts might not on their own provide reasonable suspicion to conduct a dog sniff, when added to the information obtained before the stop, the known facts clear that hurdle. *Cf. Calvetti*, 836 F.3d at 667 (finding reasonable suspicion based on "two strong[] indicators [of criminal activity]: (1) 'vague' or 'dubious' travel plans, and (2) relevant criminal history," in addition to a number of weaker indicators, including nervousness, erratic driving, and inconsistent statements of the vehicle's ownership status. (quoting *United States v. Stepp*, 680 F.3d 651, 666–67 (6th Cir. 2012))).

Salas fails to adequately address the significance of the information provided by the CI, arguing in a footnote that "Duane's testimony at the suppression hearing confirms that he conducted the traffic stop because he observed [traffic violations]," rather than due to suspicion of drug activity. Reply Br. at 4 n.1. This is incorrect. Although Duane admitted to making the stop upon observing traffic violations, he also responded affirmatively to Salas's counsel's question that "you just didn't stumble upon this vehicle and decide to pull it over for not using its turn signal. You are suspecting that this vehicle was loaded down with drugs, right?" R. 206, PID 1077. Duane also testified that he met with the surveillance team and was briefed on the investigation prior to the stop, and that he began following the vehicle after receiving word that the gold Jeep was the subject of the drug investigation. *See Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008) ("[T]he officer's reasonable suspicion need not arise exclusively from his own direct observations. Rather, it can be derived from such sources as informant tips, dispatch information, and directions from other officers." (citations omitted)). When considering all the information Duane possessed, the totality of the circumstances supports the district court's finding of reasonable suspicion of drug activity, and Salas does not argue that officers failed to diligently

pursue their investigation to confirm or dispel that suspicion through the use of a drug-sniffing dog.

Accordingly, we affirm the district court's denial of Salas's motion to suppress.

**III.**

Salas next argues that the evidence was insufficient to sustain his convictions of possession with intent to distribute cocaine and conspiracy to distribute narcotics. The evidence is sufficient if, viewing the evidence in the light most favorable to the government, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Gooch*, 850 F.3d 285, 288 (6th Cir. 2017) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "A defendant challenging the sufficiency of the evidence 'bears a very heavy burden.'" *United States v. Collins*, 799 F.3d 554, 589 (6th Cir. 2015) (quoting *United States v. Davis*, 397 F.3d 340, 344 (6th Cir. 2005)).

Possession with intent to distribute a controlled substance under 21 U.S.C § 841(a)(1) requires proof "that the defendant: (1) knowingly (2) possessed a controlled substance (3) with intent to distribute." *Calvetti*, 836 F.3d at 668 (citing *United States v. Coffee*, 434 F.3d 887, 897 (6th Cir. 2006)). Conspiracy to distribute under 21 U.S.C. § 846 requires proof of (1) "an agreement to violate drug laws," (2) "defendant['s] knowledge of, and inten[tion] to join, the conspiracy," and (3) "defendant['s] participat[ion] in the conspiracy." *Id.* at 667–68 (citing *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005)). Once the existence of a conspiracy is established, an individual defendant's connection to it "need only be slight." *Id.* at 668 (quoting *Martinez*, 430 F.3d at 330). "[A] defendant's knowledge of and participation in a conspiracy may be inferred from his conduct and established by circumstantial evidence." *Id.* (quoting *Martinez*, 430 F.3d at 330).

Salas argues that the government failed to prove that he had the requisite knowledge to sustain each conviction. Regarding the conspiracy charge, Salas argues that "the record is insufficient to establish that [he] knew the ultimate purpose of the conspiracy." Appellant's Br. at 25. According to Salas, "th[e] evidence established only that [he] was present in a vehicle that was being utilized in criminal activity." *Id.* at 26. Salas further contends that the only evidence of his knowledge of the drugs was their mere existence in the vehicle. Regarding the possession-with-intent-to-distribute conviction, Salas similarly asserts that "the record contains insufficient evidence that [he] knowingly possessed drugs." *Id.* at 29. Salas's arguments on both counts are essentially the same: that the evidence merely shows he was the unwitting passenger in a vehicle being used for criminal activity but that he had no actual knowledge drugs were being transported.

To support his argument, Salas primarily relies on *United States v. Morrison*, 220 F. App'x 389 (6th Cir. 2007), and *United States v. Sliwo*, 620 F.3d 630 (6th Cir. 2010). *Morrison* involved a drug-trafficking scheme where the defendant met load drivers at a hotel and led one of them back to the defendant's residence to store the vehicle with narcotics in the defendant's garage. 220 F. App'x at 390. The defendant had known the other co-conspirators for many years, made comments to the load driver about a "run" and being "clean," mentioned an unrelated drug bust to the load driver, misrepresented his place of residence to officers, and exchanged sums of money with the other co-conspirators. *Id.* at 395. A divided panel reversed the conspiracy conviction. *Id.* at 398. The majority recognized that "a co-conspirator need not know every single detail of the conspiracy." *Id.* at 393. But it also noted that "[p]roof of knowledge is satisfied by proof that the defendant knew the essential object of the conspiracy." *Id.* (alteration in original) (quoting *United States v. Christian*, 786 F.2d 203, 211 (6th Cir. 1986)). The court explained that "the emerging and consistent principle is that 'conjecture and surmise regarding what a defendant may have

intended or known is insufficient to support a conviction.'" *Id.* at 395 (quoting *United States v. Coppin*, 1 F. App'x 283, 291 (6th Cir. 2001)). Applying that principle, the court found that although the evidence "shows [the defendant] had knowledge of *some* illegal activity, . . . it fails to show . . . that [he] knew the purpose of all this activity centered around drugs—the 'essential object of the conspiracy' in which he was charged." *Id.* (quoting *Christian*, 786 F.2d at 211).

Similarly, a divided panel in *Sliwo* held that the evidence was insufficient to support the drug-conspiracy charges because, like in *Morrison*, the government failed to link the defendant to the specific drugs being trafficked. 620 F.3d at 634, 637. The defendant in *Sliwo* was observed by officers following an empty van prior to the vehicle being filled with marijuana. *Id.* at 632. While the other co-conspirators were packing the van with marijuana in a truck yard, however, the defendant was driving back and forth outside of the truck yard in a separate vehicle, apparently acting as a lookout. *Id.* at 632–34. The defendant was also seen following the van after it was filled with contraband. *Id.* at 632–33.

Reasoning that "the evidence in this case demonstrates a weaker link between the defendant and the drugs than did the evidence in *Morrison*," the court concluded that there was "[in]sufficient evidence tying Defendant to the actual drugs found." *Id.* at 635–36. The court found it critical that there was no evidence that the defendant "ever set foot in the van or that he had any substantive discussions with . . . the three people who eventually saw the marijuana loaded in the van." *Id.* at 634. Accordingly, the court concluded that the evidence that the defendant helped to transport the van and served as a lookout "arguably shows that Defendant was engaged in a scheme with some sort of criminal purpose. The evidence, however, fails to demonstrate that Defendant knew that this conspiracy involved marijuana as opposed to stolen electronic equipment, counterfeit handbags, weapons, or any other illegal object that could be transported in a van." *Id.* at 636.

The government argues that *Calvetti* is more analogous to the facts here. In *Calvetti*, the defendant was the driver and owner of a vehicle in which officers discovered sixteen kilograms of cocaine following a traffic stop. 836 F.3d at 659–60. As officers were searching the vehicle, the defendant and her passenger were moved to a patrol car, where their conversation was recorded. *Id.* There they discussed whether their stories had matched, and, as the search progressed with officers utilizing a drug-sniffing dog, the defendant became increasingly nervous. *Id.* at 668. She asked the passenger if "this thing" opens (allegedly referring to the hidden compartment of narcotics) and, when officers began searching where the drugs were located, told the passenger to take the blame if they find "it." *Id.* The defendant also took a cell-phone call from another co-conspirator, informing him that "[it's] really bad" and that officers were searching the vehicle with a drug dog. *Id.* at 669 (alteration in original). She then deleted this co-conspirator's contact information from her phone. *Id.* A later search of the defendant's residence revealed drug-packaging materials "similar to those used to wrap the cocaine found in the minivan." *Id.* at 660.

In finding this circumstantial evidence sufficient for a jury to infer the defendant's knowledge of the hidden drugs, the court focused heavily on the defendant's recorded conversation in the patrol car, particularly her apparent references to the hidden compartment and her "constant preoccupation with the activity of the drug-sniffing dog." *Id.* at 669. The court then proceeded to briefly distinguish *Morrison*:

> In that case, the defendant allowed an alleged co-conspirator to store a car in his garage but there was no evidence that the defendant knew of the hidden drugs. In this case, by contrast, there is circumstantial evidence to suggest Calvetti knew there was contraband in the minivan and additional circumstantial evidence that she knew the contraband was narcotics that could be detected by a drug-sniffing dog.

*Id.* at 669 (citation omitted). The court also distinguished *Sliwo* because that defendant "merely served as a lookout and was never seen in the van where the drugs were uncovered." *Id.* at 669

(citation omitted). The court concluded that "the jury could reasonably infer from Calvetti's comments and actions in the patrol car, and the evidence of drug packaging materials found at her residence, that she was actively involved in a drug trafficking conspiracy . . . and was aware of what [they] were transporting in the minivan." *Id.* at 670. The court accordingly affirmed the defendant's drug-trafficking convictions. *Id.*

Although the evidence in this case was not as strong as in *Calvetti*, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences in its favor, the evidence was sufficient for a rational juror to find beyond a reasonable doubt that Salas knew that cocaine was hidden in the trailer. The jury heard extensive testimony from both Ramos and Mejia that established Salas's leading role in preparing for and coordinating the delivery. Mejia, who claimed that he did not know that they were transporting a large quantity of cocaine, testified that Salas solicited Mejia's initial involvement and paid for the trailer in Arizona. Salas covered numerous other expenses, too, including fees for Mejia to open a bank account, the registration fees for both the Jeep and trailer, gas during the trip, and the cost of a hotel on the way to Lexington. Salas made the plan to go to Memphis and leave the trailer there. Salas instructed Mejia where to drive. Salas also coordinated the meeting with Ramos and instructed her on what to do after the stop occurred. Finally, Salas was the one who suggested to Mejia to say they were traveling to an aunt's house, and he also instructed Ramos to be ready to corroborate this story and requested from her a false address to provide officers. Salas's role as the primary person orchestrating the delivery of the trailer via an interstate trip distinguishes this case from *Morrison* and *Sliwo*, as both defendants in those cases played much more minor roles in the conspiracies.

Ramos's additional testimony regarding the two prior, similar deliveries provides a further link allowing reasonable jurors to infer Salas's knowledge of the drugs in this case. In each of

those earlier deliveries, Ramos coordinated with similar load drivers who were aware of the presence of narcotics and either discussed the narcotics' presence prior to the delivery or helped unload them upon arrival. The circumstances of the prior deliveries, along with Salas's extensive role in planning the May 18 delivery, could allow a rational juror to infer that a person in Salas's role in the conspiracy would know that the ultimate purpose of the conspiracy was to transport cocaine. *See United States v. Anderson*, 747 F.3d 51, 70–71 (2d Cir. 2014) ("It may be possible to imagine a circumstance in which an experienced drug smuggler could decide to entrust a million-dollar package of contraband to an unwitting courier. There is, however, simply no evidence that the conspiracy at issue in this case ever operated in this fashion." (footnote omitted)).

We therefore affirm Salas's convictions.

**IV.**

Finally, Salas argues that his sentence is substantively unreasonable because the district court unreasonably weighed the relevant sentencing factors. We review a district court's sentence for substantive reasonableness under a "deferential abuse-of-discretion standard." *United States v. Demma*, 948 F.3d 722, 727 (6th Cir. 2020) (quoting *United States v. Reilly*, 662 F.3d 754, 761 (6th Cir. 2011)). "This inquiry requires us to determine whether 'the court placed too much weight on some of the § 3553(a) factors and too little on others.'" *Id.* (quoting *United States v. Rayyan*, 885 F.3d 436, 442 (6th Cir. 2018)). "The applicable Guidelines range represents the starting point for substantive-reasonableness review because it is one of the § 3553(a) factors and because the Guidelines purport to take into consideration most, if not all, of the other § 3553(a) factors." *United States v. Haj-Hamed*, 549 F.3d 1020, 1025 (6th Cir. 2008) (citing *Gall v. United States*, 552 U.S. 38, 49–50 (2007)). "If the sentence is within the Guidelines range, the appellate court may . . . apply a presumption of reasonableness. But if the sentence is outside the Guidelines

range, the court may not apply a presumption of unreasonableness." *Gall*, 552 U.S. at 51 (citation omitted). Although "we do not use any form of strict proportionality review, the greater the district court's variance, the more compelling the evidence must be." *United States v. Robinson*, 669 F.3d 767, 775 (6th Cir. 2012) (citations omitted).

Given the applicable 120-month mandatory-minimum sentence, Salas's Guidelines range was 120–121 months' imprisonment. The district court applied a modest upward variance and sentenced Salas to 127 months' imprisonment. The district court explained that it considered Salas's recruitment of Mejia, Salas's role and the quantity of cocaine involved in the May 18 delivery, and Salas's prior deportation as aggravating factors necessitating an upward variance. Salas argues that the district court placed unreasonable weight on the scope of Salas's involvement in the offense because Salas played only a minor role in the overarching drug conspiracy, which the district court itself recognized by sustaining his objection to the drug-quantity calculation. Thus, Salas contends that his involvement "more strongly supported a downward adjustment for his limited involvement than an upward variance based on his supposed aggravating role." Reply Br. at 13. Salas does not address the other reasons the district court gave for varying upward.

We discern no inconsistency in the district court's rationale. The district court made its drug-quantity finding, which significantly lowered Salas's Guidelines range, because there was no evidence linking Salas to the heroin and fentanyl seized from McIver's home. This finding is not inconsistent with the district court's conclusion that the Guidelines did not adequately account for Salas's role in trafficking the drugs for which he *was* held responsible, where Salas played a major role in planning the trip and recruited another person. Based on the evidence it heard firsthand at trial, the district court reasonably concluded that Salas's role in the offense was one of several factors supporting a slight upward variance. Given the deference we afford to district courts'

sentencing determinations, Salas has not established that the district court abused its discretion in imposing an above-Guidelines sentence.

**V.**

For the reasons set out above, we AFFIRM.